**LATIMER et al. v. UNITED STATES,**
and four other cases.

Nos. 2518–RJ, 2519–PH, 2520–O'C, 2521–PH,
2522–Y.

District Court, S. D. California,
Central Division.

Oct. 25, 1943.

Ivan G. McDaniel and George C. Lyon,
both of Los Angeles, Cal., for plaintiffs.

Charles H. Carr, U. S. Atty., and E. H. Mitchell, Asst. U. S. Atty., both of Los Angeles, for defendants.

McCORMICK, District Judge.

The above entitled five actions have been consolidated. They involve similar issues. Each cause is brought for the recovery of Social Security taxes which were paid by respective plaintiffs to the Government between the years 1936 and 1939. The separate status and activities of each plaintiff are hereinafter substantially stated. Generally, the taxes were imposed and the collections made under the Social Security Act of August 14, 1935, 49 Stat. 620, 42 U.S.C.A. § 301 et seq., and, specifically, the exactions here involved pertain to Title VIII of the Act, 42 U.S.C.A. § 1001 et seq. (Old Age Benefits), and Title IX thereof, 42 U.S.C.A. § 1101 et seq. (Unemployment Insurance). The plaintiffs each assert the right to recover the taxes that such plaintiff has been compelled to pay upon the ground that the services of the employees of plaintiffs, respectively, upon which such taxes were exacted, should be classified "agricultural labor" and therefore exempted from taxation under provisions of the Social Security legislation.

In the two applicable titles of the Social Security Act "agricultural labor" is expressly exempted from taxation, but the original Act nowhere defined "agricultural labor," and not until the amendments of August 10, 1939, effective January 1, 1940, did Congress directly establish the meaning of such type of employment (see 26 U.S.C.A. Int.Rev.Code, §§ 1426(h) and 1607(l), but under congressional authority in the original Act the Treasury Department duly promulgated Regulations Number 90, Article 206(1-b), and Number 91, Article 6(b), relating to Titles IX and VIII, respectively, wherein the following definitions and interpretations of "agricultural labor" are given:

"The term 'agricultural labor' includes all services performed—

"(a) By an employee, on a farm, in connection with the cultivation of the soil, the harvesting of crops, or the raising, feeding, or management of live stock, bees, and poultry; or

"(b) By an employee in connection with the processing of articles from materials which were produced on a farm; also the packing, packaging, transportation, or marketing of those materials or articles. Such services do not constitute 'agricultural labor,' however, unless they are performed by an employee of the owner or tenant of the farm on which the materials in their raw or natural state were produced, and unless such processing, packing, packaging, transportation, or marketing is carried on as an incident to ordinary farming operations as distinguished from manufacturing or commercial operations.

"As used herein the term 'farm' embraces the farm in the ordinarily accepted sense, and includes stock, dairy, poultry, fruit, and truck farms, plantations, ranches, ranges, and orchards.

"Forestry and lumbering are not included within the exception."

■ It is clear that the broadened definition of "agricultural labor" contained in the amendments of August 10, 1939, to the Social Security Act are not applicable to these cases and that each of these actions is governed by the definition of "agricultural labor" in Regulations 90 and 91, supra. See Fosgate Co. v. United States, 5 Cir., 125 F.2d 775; Cowiche Growers, Inc., v. Bates, 10 Wash.2d 585, 600, 117 P.2d 624.

■ There is no language in the extensive amendments of 1939 to the Social Security Act, and nothing in the proceedings leading up to the changes made at that time, which manifest or indicate any legislative intent to amplify the statutory term "agricultural labor" so as to make such amendments applicable to activities which antedate January 1, 1940 (as do all of the services involved in these cases), and in such a situation the Regulations 90 and 91, supra, promulgated by the Treasury Department which is charged with the administration of the taxing features of the Act and in effect throughout the applicable years should be given great weight in the decision of these actions. Jones v. Gaylord Guernsey Farms, 10 Cir., 128 F.2d 1008; Nicholas v. Richlow Mfg. Co., 10 Cir., 126 F.2d 16.

The paramount and crucial question for decision in each consolidated case is: What services, if any, that are shown by the record to have been performed by employees of the respective plaintiffs during the applicable periods of time and concerning which taxes were exacted from respective plaintiffs properly fall within the statutory designation "agricultural labor" considered in the light of the foregoing cited Articles of identically worded Treasury Regulations

90 and 91, supra, and pertinent authoritative decisions of federal courts?

In evaluating the services with which we are concerned in these consolidated cases, the traditional concept of the farmer is an individual working in his own soil and upon his own premises in every detail from planting to delivering the products to consumers, instead of solely an element or unit in an entity essentially commercial in character, as are the packing houses of citrus associations of the State of California, has to a considerable extent occasioned confusion in judicial decision in ascertaining the legislative intent in attempting to solve the problem of modern industrialized and departmentalized agriculture.

The principal reason for exempting "agricultural labor" from social and industrial benefits resulting from remedial legislation has been administrative difficulties and accounting inconveniences in farm work, but with relation to employment in and operation and management of packing houses by the respective associations no such impediment exists. On the contrary, the efficiency, economy and skill with which such units in the citrus fruit industry are operated by boards of directors and expert business managers complemented with systematic office service entirely removes administrative difficulties of any kind as a barrier to the application of Social Security legislation in such co-operative packing house activities.

Epitomized, plaintiffs' separate activities during the applicable period as shown by the record before the court are as follows:

Charles Latimer and Winifred S. Latimer, doing business as San Antonio Orchard Company:

San Antonio Orchard Company (sometimes called the Company) is a partnership formed in 1931, and organized for profit. It is not a co-operative enterprise. The physical plant was located at Ontario, San Bernardino County, California. The partnership owned about 80 acres planted in citrus fruit in Riverside County, California, from which 80-acre tract it picked and packed for its own account. In addition thereto it picked and packed from about 1,150 acres of citrus fruit belonging to others. Of the total fruit handled by the partnership approximately 85% was handled for the account of the growers, while the balance of other growers' fruit

was purchased for cash. The groves averaged 10 to 15 miles from the packing house. When the fruit was handled on consignment the partnership packed and sold it for the grower and returned to the grower the sum it brought less the actual cost of picking, hauling and packing. The number of employees was seasonal, more being needed during the winter months, so that the number varied from 15 to 100. The picking was done in crews of 15 men each. Normally there were from two to five crews employed. The men would congregate in a section of town where the majority lived and after receiving directions at that place would travel to the orchards in automobiles or a truck owned by a picker. The men had their own sacks, clippers and gloves. The partnership furnished the ladders. The fruit was placed in field boxes which belonged to the partnership and deposited in the groves by the growers. The fruit was hauled from the grove in trucks to the packing house by the grower or his selectee, the partnership having no transportation facilities. At the packing house the fruit was unloaded onto a conveyor, placed in a curing room for several days and thereafter washed, dried, waxed, graded and packed. From 20 to 60 persons were employed in the packing house. 25 women usually packed, while 10 persons graded. The other employees received, trucked and tallied the fruit. All fruit must comply with the State Standardization Act of California, and the quality and marketability is determined under the State law, after it is completely processed in the packing house. The partnership also shipped grapes, some of which it purchased on a cash basis and others it shipped on consignment. In the grape deals the partnership did none of the picking but did lid the boxes in the field and usually paid the labor to move these boxes to refrigerator cars, to which they are taken direct from the vineyard. Those employees not working for the partnership during the summer usually picked walnuts and grapes, or did general farm work for other growers. Some of the employees in the plant also worked in the field, performing such duties as spraying the partnership's trees and filling smudge pots. Occasionally other growers would employ these workers, and in such event the other grower would pay the laborer.

The partnership had customers throughout the United States who purchased the

fruit through plaintiffs' brokers. The identity of the fruit and its proceeds was maintained and kept separate for each grower.

Rancho Sespe:

Rancho Sespe is a California corporation operating its 4,100-acre ranch in Ventura County, California, upon which it raised oranges, grapefruit, lemons, walnuts, miscellaneous vegetables and alfalfa. It is affiliated with the California Fruit Growers Exchange. Approximately 1,000 acres was devoted to citrus fruits. The oranges were packed (but apparently not picked) by the Mupu Association, a co-operative. The lemons were packed by the ranch's own packing house. The ranch had in the years in question 250 to 400 employees, who lived in the ranch village, or in neighboring towns. On the ranch there were located blacksmith shops, carpenter and paint shops, implement sheds and packing sheds.

In the ranch's packing house there were employed some 40 to 100 workers. No Social Security taxes were paid or demanded as to these employees. Demand was made for such taxes relating to the blacksmith who shod horses and repaired the various farm implements. Demand was also made for such taxes relative to the three carpenters who repaired the ranch buildings, made drying trays, hayracks, and did some mechanical work, as well as occasionally engaging in frost protection of the ranch. These and the blacksmith were employed on a full-time basis by the ranch. Social Security taxes were also demanded for the two mechanics who maintained the automotive equipment of the ranch tractors and gas engines, consisting of about 50 machines, including automobiles and spray machines, and who also helped in general farm operations. The mechanics also were employed full time by the ranch. The pickers also pruned, hoed, gathered walnuts, and did general farm work on the ranch. The packing house employees also "work in the field at one time or another," as well as engaging in frost protection on the ranch. The ranch also employed two or three individuals as clerical help to do the general bookkeeping; to make up payrolls, and to do general farm accounting. They also were subject to call on frost protection. They worked only for the ranch. The tax collecting agencies demanded payment of taxes on these employees during the years in question. The ranch did no work for others.

Seaboard Lemon Association:

The Seaboard Lemon Association is a co-operative association organized in 1936 under Chapter 4, Division 6 of the California Agricultural Code, section 1191 et seq., and has its principal place of business and carries on its operations in Ventura County, California. It has a manager and a clerical and bookkeeping office force. The Association packs only lemons, and its membership is composed of 45 grower-stockholders, who have groves one-fourth to fourteen miles from its packing house, which is located at Oxnard, Ventura County, California. The Association employed during the years in question from 50 to 200 pickers, depending upon the season, and employed 50 to 175 in the packing house, composed generally of 60 packers, 15 graders, and the remainder comprising receivers, truckers, washers, and a handyman. The Association handled no fruit of its own. It picked only for its members and the separate identity of each grower's fruit was maintained from the moment it was picked until such time as it was loaded on refrigerator cars in packed boxes. The California Fruit Growers Exchange was the marketing agent for the Association. About once each month inspectors from such Exchange inspected the plant. Approximately $500,000 to $600,000 was invested in the plant and its equipment. The Association is affiliated with the Exchange Lemon Products Company which manufactures by-products of citrus fruits and which is an affiliate of the California Fruit Growers Exchange. The Association functioned also with Fruit Growers Supply Company, another exchange affiliate, from which it bought at cost shook wood for the manufacture of boxes used in its activities. The boxes are made by a machine operated, at the packing house, by an operator employed by the Association. The Association shipped about 400 cars of lemons each year from the members' 1,600 acres. The proceeds from each grower's fruit are separately maintained.

La Verne Co-operative Citrus Association:

La Verne Co-operative Citrus Association was organized as a co-operative under Chapter 4, Division 6 of the California Agricultural Code, supra, and has a packing house at La Verne in which it has invested about $450,000. The Association itself neither grows nor purchases fruit. During the years in question it had between 225 and 250 members for whom it handled

navels, valencias, grapefruit and lemons the year around. Each member has one vote which is cast at annual election of directors, who, with a manager, exercise control of the Association's activities. The members have their acreage usually within ten miles of the packing plant, and each member averages about 15 acres of citrus products. The Association employed from 50 to 250 pickers, and from 25 to 250 persons were employed in the packing house; 90 acted as packers, 10 to 25 as graders, 10 to 25 as washers, and 2 lidded boxes, while 2 or 3 stacked them. The Association manufactured its own boxes from shook wood. It was a member of Mutual Orange Distributors, a marketing co-operative, which sold the fruit for the Association. From the time the Association placed the fruit in refrigerator cars it lost control over it, hence it employed no labor to market the fruit. The grower, as in the other consolidated cases, was consulted before the Association picked, and he normally told the Association the part of the grove he wanted picked, whether or not to strip the trees or otherwise determine the manner of picking. Sometimes, however, a grower picked his own fruit with his own crew.

In this case, as in all cases under consideration, there could be no fruit marketed until it was washed, sorted and graded. The Association owned no trucks. Sometimes the growers would haul their own fruit to the packing house, and at other times trucks were hired for the grower. The pickers and packers were paid in accordance with the number of boxes picked or packed. The office force consisted of a bookkeeper and a stenographer. In addition the Association employed a general utility man and a watchman.

Frances Citrus Association:

Frances Citrus Association is a co-operative association, organized under Chapter 4, Division 6 of the Agricultural Code of California, supra, and had a packing house four miles northeast of the Irvine Station in Orange County, California. During the years in question it had about 87 members who owned about 1,400 acres in oranges. The Association handled only oranges, and as an owning entity had approximately three acres in oranges. It had from 25 to 100 pickers who were employed about eight months during the year. The remaining four months no pickers were employed. In addition to picking they worked for the Association by fumigating for the members, pruning and doing other orange cultural work. The Association had its own trucks and employed labor to haul the fruit from the groves in boxes to the packing house. About 8 laborers engaged in this activity and, in addition, they distributed empty field boxes in the orchards. The Association also employed 2 or 3 persons who did root cutting for the members, the major portion of which was done under the general supervision of the grower. No work was done for other growers or persons. No grower member picked his own fruit. The separate identity of each grower's fruit was maintained. In the packing house there were employed from 10 to 85 workers, of whom 40 packed, 15 graded, and the remainder washed, received, trucked, hauled empty boxes and ran a box machine. The Association is an affiliate and marketed through the California Fruit Growers Exchange. Carpenters were hired by the day to repair houses which belonged to the Association but which were used by the pickers. The Association employed a welder in its activities. In this case, as in other consolidated cases, the grower paid for his actual cost of picking and a pro-rated share in packing costs. Occasional meetings of the growers were held to discuss and decide by majority pooling, packing and "things to be changed in the packing house."

The strict and exacting terms of California statutes, such as the State Standardization Act, Agricultural Code of California, St.1933, p. 168, as amended by St.1935, p. 781, Section 751 et seq., requiring uniformity in processing citrus fruits before marketing them, as well as the systematized marketing of such commodities through growers' co-operatives and integrated units called "exchanges", have so changed the methods of citrus fruit farming that very often the line of demarcation between "agricultural" and so-called industrial enterprise in the departments of such husbandry is not easily drawn. They present borderline situations. But when consideration is given to the record before the court which shows that during the last year of the period involved in these cases approximately 80% of the citrus fruit produced in California and Arizona, aggregating nearly 33,000,000 boxes, was controlled from the trees in the orchards to the packing houses and thence to the markets throughout the United States and foreign

countries by co-operative associations of growers, the many kinds of work required in this wide and mechanized field of action itself demonstrates the ineptitude of characterizing it all as "agricultural labor." Some of it falls clearly within the terms of regulations involved, while other activities can not be so regarded. Therefore a realistic approach to the social and economic security of employees in present-day large scale enterprises of all kinds requires that all doubt in construing remedial statutes providing unemployment insurance and old age protection and containing tax impositions should favor coverage rather than exemption. Of course the ordinary and generally accepted meaning of language used in the statute and in valid interpretative regulations of the statute cannot be ignored. Revenue raising is not the sole purpose in such legislation and the rule of strict construction in favor of the taxpayer is not applicable.

The labor or services generally described in each action and with which we are concerned in these cases can be best considered by arranging it primarily into two broad categories: First, services rendered concerning fruit grown on the land of other growers, and second, work done on plaintiffs' lands in respect of growing, packing and marketing fruit grown by plaintiffs. But our examination of the activities of the separate plaintiffs as disclosed by the evidence before the court we think necessitates a further and more minute segregation in each category in order to properly characterize services relating to production and marketing of citrus fruits in California.

■ By summarizing a table, plaintiffs' exhibit 12, which is a stipulated classification under each of the aforesaid broad categories of work by each plaintiff, we shall proceed to group, consider and determine the questioned activities in each of the five cases:

1. Plowing, discing, planting, cultivating, irrigating, root cutting, spraying, pruning, dusting, fumigating, and other cultural and maintenance labor and services performed for others. In this segregation the Frances Citrus Association alone is involved.

All of such specified services directly and inherently pertain to the farm or orchard. These activities connote true "agricultural labor." They are inseparably attached to and associated with the cultivation of products of the soil. The fact that the services are rendered by employees of an entity other than the owner or tenant of the orchard is of no consequence, as the controlling part of the regulations is paragraph (a) thereof, which contains no requirement as to the status of the employer of the one doing the work specified. It is the kind of work done and the locale of it which controls under the Regulations.

Such is undoubtedly the effect of the decision of our Circuit Court of Appeals in Stuart v. Kleck, 9 Cir., 129 F.2d 400, where it was held that men employed to clear, level, grub, plow, disc and generally prepare land for the growing of crops thereon were doing agricultural work which was exempt from taxes under the Social Security Act despite the fact that such services were rendered by an independent contractor on another's land. To the same effect is Fosgate Co. v. United States, 5 Cir., 125 F.2d 775.

It is clear that the work specified in subdivision 1 of the first broad category is exempt from taxation under the Social Security Act as "agricultural labor."

2. Carpentry, mechanical and blacksmith work, including maintenance of machinery, equipment and buildings.

This subdivision of services is applicable solely to plaintiffs Frances Citrus Association and Seaboard Lemon Association, respectively. Neither of such entities handles fruit owned by itself except in the case of Frances Citrus Association, which owns about three acres in citrus fruits.

The above described group of services pertains to and is directly associated with (except to a very minor degree in Frances Citrus Association) packing house activities and correlated industrial and mechanical functions of entities not primarily engaged in ordinary farming. The work is all incidental to the dominant purpose for which the two associations were primarily organized. This was to provide the individual citrus growers who were members of the respective associations with facilities whereby the fruit of each individual grower after production is received, packed and marketed substantially at cost. The only direct orchard activities practiced by these entities were "picking and other harvesting," which are activities not included in

this subdivision 2, but which are considered and dealt with in segregation 3 in this memorandum decision.

In North Whittier Heights Citrus Ass'n v. National Labor Relations Board, 109 F. 2d 76, 81, the Circuit Court of Appeals of the Ninth Circuit points out distinguishing features in the consideration of remedial statutes in the industrial relationships of packing house services performed by employees of an individual grower upon his own products in his own physical plant and packing house and packing house services rendered by employees of an association or confederation of individual growers working in a packing house distant from the producing orchards and operated and conducted by an entity legally separate and distinct from the individual growers who fruit such employees are processing and preparing in such packing house for marketing.

In the North Whittier Heights Ass'n decision the court quotes with approval the following "apt language" in Pinnacle Packing Co. v. State Unemployment Comm., an unreported decision of Circuit Court of Jackson County, Oregon, decided February 19, 1937: "The fruit growers who are engaged in the care, cultivation, picking, and delivery of the products of the orchard to be processed, graded, packed and marketed are engaged in agricultural labor and are exempt from the provisions of the statute. As soon as the fruit is delivered by the growers to the plaintiff for processing, grading, packing, and marketing, then the exemption ceases. The plaintiffs engaged in processing, grading, and packing and marketing the fruits are engaged in industry and are, therefore, subject to the provisions of the act and are not exempt as being engaged in agricultural labor."

█ The work specified in subdivision 2 is in no better position for exemption than actual packing house employees of respective associations, and are not to be classified as "agricultural labor," under the Act and Regulations.

3. Picking and other harvesting of fruit raised on the land of other growers, and transportation of such fruit to the packing house.

This classification of labor applies to all plaintiffs except Rancho Sespe, which picks only for itself.

The test for ascertaining whether or not the services in this subdivision should be considered "agricultural labor" is that established in Stuart v. Kleck, supra, namely, what is the nature of the services furnished and were they performed upon a farm?

The record in these cases shows that the work done in picking and other harvesting of the fruit is arranged for, directed and supervised by the individual grower in collaboration with the respective packing house manager. It is all done in the grower's orchard, in other words, on the farm, and it all precedes delivery of the fruit for processing or marketing purposes. Thus the stage of operations at which such services cease to be an incident to ordinary farming and become incidental to the commercial operations of the packing house is reached after the fruit has been picked and upon actual delivery of the fruit to the employees of the association for transmission to the packing house. The service of such employees then loses its "agricultural" nature and is industrial in character and is an "off the farm" incident to the business of the co-operative packing house as distinguished from farming operations. See Pinnacle Packing Co. v. State Unemployment Comm., supra.

█ It follows that all harvesting services in subdivision 3 are to be exempted from the taxes imposed under Titles VIII and IX of the Social Security Act, while actual transportation labor ·to the packing houses of plaintiff associations is subject to the taxes imposed.

4. Washing and other treatment, grading, packing, selling, marketing, shipping, and similar labor rendered in respect to fruit of other growers, and in respect to fruit purchased outright.

█ All plaintiffs except Rancho Sespe are involved in this classification. San Antonio Orchard Company also purchased some fruit outright upon which it rendered this classification of services.

None of these services in subdivision 4 can be properly classified as "agricultural labor" within the meaning of the applicable regulations and analogous decisions of federal and state appellate courts. All relate particularly to a commercial rather than to an "agricultural" enterprise, to-wit, the packing house, unassociated with and disconnected from the producing orchards. The activities are strikingly similar to those determined by the Fifth Circuit Court of Appeals in the Fosgate Co. case, supra, to be incidental to so-called indus-

trial pursuits. The services pertain, not to the growing, cultivating or harvesting of the fruit, but are rendered in connection with processing and marketing operations "off the farm," which by reason of modern business methods practiced in the citrus industry have become essentially mercantile and manufacturing functions.

5. Executive, administrative, accounting, stenographic, clerical, office and similar types of labor performed with respect to harvested fruit grown by others.

 This labor is involved only in Frances Citrus Association, Seaboard Lemon Association and La Verne Co-operative Citrus Association cases.

This classification of services in the above actions is "off the orchard labor," but even if this type of work had been performed "on a farm" and for the farmer himself, it does not constitute "farm" or "agricultural labor" as such terms are commonly understood, or within the meaning of the Social Security Act and the regulations promulgated in reference thereto. To qualify in this category of work the employees are utilizing trade skill, special training, professional services and experience not in any way particularly associated with farming.

In Jones v. Gaylord Guernsey Farms, 10 Cir., 128 F.2d 1008, 1011, a large dairy farm enterprise sued to recover Social Security taxes paid to the Government for the same years that are involved in these consolidated actions. Among the employees concerning whom the tax exactions occurred there was a bookkeeper and a stenographer of the farm rendering services in relation to farming activities of the taxpayer. In holding such services to be not "agricultural labor," the court said: "A somewhat different situation is presented as to the bookkeeper and the stenographer. Not every operation or service in or about a farm is agricultural labor within the ordinarily accepted meaning of the term, and as it is used and understood in the regulations. Every farmer has need of a veterinary. It may be essential or highly desirable, especially during these days of increasing Government regulations, for a farmer to employ bookkeepers, accountants, income tax experts, or even attorneys. The regulation implies that the term 'farm' as used therein embraces the farm in the ordinarily accepted sense. We ordinarily think of a veterinary, a bookkeeper, an accountant, or a secretary, as one who, through special training, has become skilled in a trade, calling, or profession. Work performed by them for a farmer does not constitute farm labor nor make of them farm laborers as we understand those terms, or as they are used in the act and in the regulations promulgated pursuant thereto."

None of the services in subsection 5 should be exempted from Social Security taxes in these consolidated actions.

Finally, we come to consider the labor allocated in the second broad category of services with which we are concerned in these actions, that is to say, work done on plaintiffs' lands with respect to growing, packing and marketing fruit grown by plaintiffs. Subdivision 1 of this broad category, specified in plaintiffs' exhibit 12, is applicable solely to the action in which Rancho Sespe is plaintiff and includes the following services:

1. Carpentry, mechanical and blacksmith work and repair and maintenance of machinery and equipment in connection with growing, transporting to the packing house and packing fruit.

In Jones v. Gaylord Guernsey Farms, supra, carpenters were involved, and their duties consisted of building and repairing sheds and fences, as well as doing repair work generally. In addition they did "ordinary jobs around the farm when not otherwise engaged," a work arrangement similar to that among the employees of Rancho Sespe. The court concluded that despite the fact that plaintiff sold his milk to hotels and individuals at wholesale and retail, plaintiff was not engaged in a commercial enterprise, and that repairing fences and buildings was a necessary incident to the actual farming operations so as to constitute "agricultural labor." There is no reason for excluding mechanics on the farm from being "agricultural" workers if carpenters on the farm are so classified. Their work in maintenance of farm machinery is as incidental to farming operations as is the upkeep of a shed or the repair of a hayrack on the farm. The dominant purpose and business of Rancho Sespe was farming citrus products and the fact that it engaged in correlated activities, all, however, being incidental to farming and all on the farm, in no way changes the "agricultural" aspect of the functions of the plaintiff Rancho Sespe. The size of the rancho and the utilization of mechanical instrumentalities of agriculture do

not require that its operations be classified as manufacturing or commercial activities. They still remain ordinary farming operations within the ordinary meaning of the term and within the meaning of the regulations.

■ We hold all of the work in Rancho Sespe that is described in subsection 1 of the second broad classification of service to be "agricultural labor."

2. Washing, treating, grading and packing plaintiffs' own fruit.

■ This classification applies only to the partnership San Antonio Orchard Company. The classified work here under consideration was that performed on the fruit of the partnership which was grown upon an 80-acre citrus orchard in Riverside County, California, owned by the partnership. The record further shows that the packing house of the partnership was located in San Bernardino County, California, and about 22 miles from the producing orchard. The partnership's producing acreage furnished less than 10% of the fruit processed in the firm's packing house. The articles of co-partnership specify the business of San Antonio Orchard Company to be "buying, selling, curing, packing and shipping of fruits of every kind and description, and particularly citrus fruits and grapes, and in packing, shipping and consigning said fruits for others on a commission or brokerage basis, and the buying and selling of packing material and supplies for use in the packing of said fruits, and to do everything proper and necessary in connection with said buying, selling, curing, packing and shipping of fruits * * *." Under this situation we think that the dominant purpose and business of the partnership was industrial rather than agricultural and that the processing services under consideration were an incident to such manufacturing or commercial operations and should not be exempted as "agricultural labor."

The only remaining services in issue in any of the consolidated actions are those specified in subsection 3 of the second broad division, to-wit:

Executive, administrative, clerical accounting, stenographic, office and packing house maintenance and similar services not included in subsections 1 and 2 of the second broad classification of work.

The work in question applies only to Rancho Sespe.

■ It is to be noted, as already observed, that the dominant purpose and business of the plaintiff Rancho Sespe was agricultural, and with respect to maintenance work and similar service in its "on the farm" packing house, such labor is an incident to the plaintiff's business and is therefore to be exempted from taxation under the Social Security Act and regulations promulgated in reference to said Act.

■ The other services in subsection 3 are not those commonly accepted as "agricultural labor," although they may be rendered on a farm and in relation to the farming activities. They are more in the nature of duties in general commercial entities—professional employment, requiring special training and skill, not associated with any specific pursuit or activity, but adaptable and generally adapted to all kinds of enterprises or industry. See Jones v. Gaylord Guernsey Farms, supra.

Two further issues in the action in which Rancho Sespe is plaintiff require consideration:

The complaint alleged and the evidence established that the plaintiff paid disputed taxes under Title VIII of the Social Security Act for the period from January 1, 1937, to December 31, 1939, and under Title IX of such Act from January 1, 1936, to December 31, 1939. Demands for the refund of such payments have been duly made in this case as well as in each of the other consolidated actions before the court and refunds have been refused by the defendant in all cases under consideration.

The defendant by separate partial defenses in the answer alleges duly made compromises and settlements by the Commissioner of Internal Revenue pursuant to Section 3761 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 3761, of portions of the claims of plaintiff and also alleges that any recovery of taxes paid by plaintiff under Title VIII of the Act should be denied to the plaintiff because plaintiff did not bear the burden of the employee's portion of such taxes, but withheld 1% of the employees' wages from which such taxes were paid and has at no time repaid to the employees such withheld taxes.

■ Plaintiff's counsel in their reply memorandum of authorities filed herein virtually concede that as to the taxes paid under Title VIII of the Act for January 1, 1937 to October 1, 1938, and under Title IX thereof for January 1, 1936, to December

31, 1937, there can be no recovery. The record before the court would warrant no other position by the plaintiff Rancho Sespe (Nelson-Wiggen Piano Co. v. United States, 7 Cir., 84 F.2d 47; Ely & Walker Dry Goods Co. v. United States, 8 Cir., 34 F.2d 429), but such accepted compromises and settlements operate here in the nature of a retraxit only as to the taxes and penalties for the periods specified and leave unaffected and subject to this action the claims to refund for all other involved period, that is to say, for the entire years 1938 and 1939 under Title IX, and the last quarter of 1938 and all of 1939 under Title VIII of the Act.

We think that the action of the Government in compromising with the plaintiff part of the allegedly defective claim for refund operates as a waiver of compliance by Rancho Sespe with Article 504, Regulation 91.

We conclude that each of the consolidated actions has been properly maintained by the respective plaintiffs as each of said plaintiffs is the entity which paid the taxes from its own funds and therefore is vested with the right to maintain suit for refund of any overpayment or excess payment of monies exacted by the Government from plaintiffs, respectively, which rightfully and equitably belong to the respective plaintiff.

Findings of fact, conclusions of law and judgment ordered in conformity with stipulations of facts of record herein and with this memorandum opinion appropriately in each of the consolidated actions. Attorneys for respective parties will collaborate, prepare and present such findings, conclusions and judgment within fifteen days from notice of this memorandum opinion.