**BURGER et ux v. SOCIAL SECURITY
BOARD et al.**

No. 355.

District Court, S. D. California, N. D.

May 15, 1946.

W. H. Stammer, of Fresno, Cal., for plaintiffs.

Charles H. Carr, former U. S. Atty., and Ronald Walker and Mildred L. Kluckhohn, Asst. U. S. Attys., all of Los Angeles, Cal., for defendants.

Arthur L. Johnson, of San Jose, Cal., amicus curiae.

Clarence A. Linn, of San Francisco, Cal., amicus curiae appearing on behalf of California State Federation of Labor.

MATHES, District Judge.

This proceeding is brought to review a final decision of the Social Security Board holding that remuneration received by plaintiff James F. Burger subsequent to January 1, 1940, was for "agricultural labor," as defined in the Social Security Act as amended in 1939, 53 Stat. 1373, c. 666, Title II, § 209, 42 U.S.C.A. § 409, and cannot for that reason be included in his "total wages" for the purpose of computing benefits payable to plaintiffs under the Act.

Section 205(g) of the Act provides for judicial review of the record made before the Board, and grants the District Court power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Board, with or without remanding the cause for a rehearing," subject to the condition that "findings of the Board as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C.A. § 405(g).

Both plaintiffs and defendants have presented motions for summary judgment under Federal Rules of Civil Procedure, Rule 56, 28 U.S.C.A. following section 723c, each claiming to be entitled to prevail as a matter of law.

There is no genuine issue as to any material fact. Plaintiff James F. Burger was employed by Rosenberg Brothers and Company at its Fresno, California, packing plant during the packing season of 1927, and was re-employed each year thereafter up to and including 1940, starting each season's work in July and finishing late in the year.

The Rosenberg Company buys, sells and processes dried fruit. While the Company's largest business is in raisins, it also handles apricots, peaches, nectarines, figs and prunes. The Company claims to be the largest packer and distributor of dried fruit in the world and to handle one-third of all dried fruit business in the United States.

The Company neither owns nor operates any farms or orchards, but purchases fruit outright from growers for processing at one of its numerous packing plants. The Fresno plant is one of the largest, employing during the peak of each season between 1,500 and 2,000 persons to grade, process,

pack, and ship dried fruit purchased from growers in the San Joaquin Valley. Employees required for these operations include weighers, graders, maintenance and repairmen, electricians, truck drivers, fruit rollers, box paperers, box makers and fibre printers.

The Company makes all sales from its head office at San Francisco. Most sales are through brokers to wholesalers and jobbers, but numerous sales are made directly to the Government, and to various chain stores and bakeries. Orders received at the San Francisco office are transmitted to the Company's various packing plants to be filled.

After an order is received at the packing plant, the dried fruit is processed, packed, and shipped to the buyer. Fruit is not processed ahead of order, but is stored in the packing plant and in various receiving stations throughout the San Joaquin Valley until sales orders call for processing and packaging. Dried fruit will keep from one to two years in the condition in which it is sold by the grower to the packing company, without further processing.

As noted in the decision of the Board, "the grower of fruit who packs his own product is a rarity in the dried fruit industry and * * * the ordinary farmer, whose average is from 20 to 40 acres, performs none of the packing house functions. After growing the fruit and harvesting it, the typical farmer hauls it to his cutting shed where his cutters slice the fruit, remove the pits, and then place the halves on drying trays which are then set in the sun. In the case of peaches, apricots, and nectarines, the grower-dryer also sulphurs them. The dried fruit is then packed into sweat boxes or sacks and is delivered and sold to the packing company. Apparently prior to the establishment of modern methods of merchandising, the dried fruit was marketed by the grower to the consumer in substantially the same state of preparation in which it is now when delivered and sold to the packing company."

The packing company's function is "to receive that fruit, grade it, clean it, wash it, sulphur it, fumigate it, and package it"—and sell it. This processing and packaging is "for appearance sake and for keeping qualities."

Throughout his employment by the Rosenberg Company, plaintiff James F. Burger's principal duty was to empty boxes or sacks of dried apricots or peaches into the hoppers of grading and processing machines.

Commencing with the advent of the tax in 1937 and continuing until termination of his employment in 1940, plaintiff James F. Burger paid all taxes imposed upon employees by the Act. 42 U.S.C.A. § 1001, 26 U.S.C.A. Int.Rev.Code, § 1400. And during the same period the Rosenberg Company likewise paid all taxes imposed by reason of having Burger in its employ. 42 U.S.C.A. §§ 1004, 1101, 26 U.S.C.A. Int.Rev.Code, §§ 1410, 1600.

In 1940, both Burger and his wife became 65 years of age. Following termination of his employment in November of that year, Burger made application for primary insurance benefits under § 202(a) of the Act, as amended, and his wife, plaintiff Maude L. Burger, filed application for the wife's insurance benefits under § 202(b). 42 U.S.C.A. §§ 402(a) and 402(b).

Primary insurance benefits—the amount payable each month to an individual after he becomes entitled to such benefits—are based upon the "average monthly wage" of the one-time wage earner. 42 U.S.C.A. § 409(e). Under a formula set out in the Act the "average monthly wage" is the quotient found upon dividing, by a specified number of quarters, the "total wages" paid an individual before he became entitled to receive primary insurance benefits. 42 U.S.C.A. § 409(f).

Since the primary benefit payable monthly to the former wage earner depends upon his "average monthly wage" which in turn depends upon his "total wages," manifestly the amount of the monthly benefit is diminished by the exclusion from total wages of any payments made for services performed prior to his becoming entitled to such insurance benefit.

The exclusion of any such earnings from total wages likewise affects the wife's benefit, which is half that to which her former-

wage-earner husband is entitled under the Act. 42 U.S.C.A. § 402(b).

The Social Security Board refused to include in Burger's "total wages" any of the payments made to him for services performed as an employee of the Rosenberg Company subsequent to January 1, 1940. Thus the monthly benefits awarded plaintiffs are less than they would have been if Burger's 1940 wages had been counted.

The Board's refusal to treat such 1940 earnings as part of Burger's "total wages" in computing plaintiffs' insurance benefits is grounded upon the contention that such 1940 wages were paid for "agricultural labor" and hence for services specifically excepted from the coverage of the Act.

As amended in 1939 [53 Stat. 1373], the Act defines "wages" to include "all remuneration for employment" and states that the term "employment" means "any service performed after December 31, 1936, and prior to January 1, 1940, which was employment as defined in § 410(b) [42 U.S.C.A. § 410(b)] * * * prior to January 1, 1940 * * * and any service, of whatever nature, performed after December 31, 1939, by an employee for the person employing him * * * except—

"(1) Agricultural labor * * * [42 U.S.C.A. § 409(a), (b) (1); 26 U.S.C.A. Int. Rev.Code, §§ 1426, 1607]."

The Board considered Burger's services to the Rosenberg Company prior to January 1, 1940, as not being "agricultural labor" within the meaning of the Act. Thus the Board held such pre-1940 services to constitute "employment" and the remuneration therefor "wages" to be included in computing Burger's insurance benefits.

At the same time the Board decided that the identical services performed for the identical employer by the identical employee after January 1, 1940, did constitute "agricultural labor" within the meaning of the Act, as amended. Thus Burger's services after January 1, 1940, were held not to constitute "employment" and the remuneration therefor not to be included as "wages" in computing plaintiffs' benefits.

The facts standing beyond dispute, the issue for decision is one of law: whether or not, after January 1, 1940, Burger's work of emptying containers of dried fruit into hoppers of grading and processing machines at the packing house of the Rosenberg Company was "agricultural labor" within the meaning of the Act, as amended.

From the time the legislation was originally enacted in 1935 until the 1939 amendment became effective January 1, 1940, Congress had made no attempt to define the term "agricultural labor" in either the Social Security Act or applicable provisions of the Internal Revenue Code. Congress had, however, empowered the Social Security Board and the Secretary of the Treasury to make and publish administrative and enforcement regulations, not inconsistent with the statute. 42 U.S.C.A. §§ 1008, 1108, 1302; 26 U.S.C.A. Int.Rev.Code, §§ 1429, 1609.

Regulations thus promulgated prior to the 1939 amendments declare that the term "agricultural labor" includes "all services performed—

"(a) By an employee, *on a farm,* in connection with the cultivation of the soil, the raising and harvesting of crops * * *; or

"(b) By an employee in connection with the processing of articles from materials which were produced on a farm; also the packing, packaging, transportation, or marketing of those materials or articles. *Such services do not constitute agricultural labor, however, unless they are performed by an employee of the owner or tenant of the farm on which* the materials in their raw or natural state were produced, *and unless* such processing, packing, packaging, transportation, or marketing is *carried on as an incident to ordinary farming operations* as distinguished from manufacturing or commercial operation. * * *" Social Security Board Rg. No. 2 (Title 20 C.F.R., Part 402.6), Article 6; Treasury Regulation 90 (Title 26 C.F.R., Part 400.206(1)), Article 206(1); Treasury Regulation 91 (Title 26 C.F.R., Part 401.6), Article 6, emphasis added.

Generally speaking, then, the regulations prior to the 1939 amendments provided two ultimate tests for determining what did or did not constitute "agricultural labor": (1) the place where, and (2) the person

for whom the service was performed. If performed "on a farm, in connection with the cultivation of the soil * * *", the service was exempt as "agricultural labor." Stuart v. Kleck, 9 Cir., 1942, 129 F.2d 400; United States v. Turner Turpentine Co., 5 Cir., 1940, 111 F.2d 400; Fromm Bros., Inc., v. United States, D.C.N.D.Wis.1940, 35 F.Supp. 145; Jones v. Gaylord Guernsey Farms, 10 Cir., 1942, 128 F.2d 1008.

If not performed on a farm, the service could not be classed as "agricultural labor" unless performed "by an employee of the owner or tenant of the farm on which the materials in their raw or natural state were produced." Fosgate Co. v. United States, 5 Cir., 125 F.2d 775, 777, certiorari denied 1942, 317 U.S. 639, 63 S.Ct. 31, 87 L.Ed. 515; Latimer v. United States, D.C.S.D. Cal.1943, 52 F.Supp. 228.

Widely followed by the states in the administration of their unemployment compensation statutes, this identity-of-employer test brought forth some striking inequities. Upon applying it, federal and state authorities found themselves forced to tax services performed for one employer and to exempt identical services performed for an employer who happened to fall into another category. Thus, a grower was not required to pay social security taxes on labor employed in packing his own fruit, while a commercial packer and a growers' cooperative were taxed. Latimer v. United States, supra, 52 F.Supp. at page 232; Fosgate Co. v. United States, supra, 125 F.2d at page 778; Batt v. United States, 9 Cir., 1945, 151 F.2d 949; Lake Region Packing Association v. United States, 5 Cir., 1944, 146 F.2d 157. A commercial handler of shade tobacco in Connecticut was required to pay unemployment compensation taxes, (H. Duys & Co. v. Tone, 1939, 125 Conn. 300, 5 A.2d 23), while the same work, performed for a grower, was held exempt from such taxes. American Sumatra Tobacco Corp. v. Tone, 1940, 127 Conn. 132, 15 A.2d 80. A fruit packer in Washington handling his own grown fruit paid no taxes (Appeal of Wenatchee Beebe Orchard Co., 1943, 16 Wash.2d 259, 133 P.2d 283), although commercial handlers and a cooperative association of growers doing exactly the same thing were compelled to pay, (In re Yakima Fruit Growers Association, 1944, 20 Wash.2d 202, 146 P.2d 800; Cowiche Growers Inc., v. Bates, 1941, 10 Wash.2d 585, 117 P.2d 624).

So under the identity-of-employer test, the large growers—those with sufficient production to support their own processing and packing plants—could market their products tax free. While identical products of the smaller growers—processed and distributed collectively through grower-owned cooperatives or independently through commercial packers—were compelled to compete for market carrying the burden of the tax. That this margin of tax exemption proved a significant factor in the market is attested by litigation which followed. Cf. Employment Security Commission v. Arizona Citrus Growers, 1944, 61 Ariz. 96, 144 P.2d 682; California Emp. Commission v. Butte County Rice Growers Association, 1944, 25 Cal.2d 624, 154 P.2d 892; Id., Cal.Sup., 1944, 146 P.2d 908; Batt v. Unemployment Compensation Division, 1942, 63 Idaho 572, 123 P.2d 1004, 139 A.L.R. 1157; Industrial Commission v. United Fruit Growers Association, 1940, 105 Colo. 223, 103 P.2d 15.

To eliminate the tax discrimination resulting from exemption of "agricultural labor" as defined in the regulations, the 1939 statutory definition was adopted by Congress. House Rep. No. 728, pp. 50, 52, 53, Senate Rep. No. 734, pp. 61, 63, 64, 76th Cong., 1st Session. And to simplify administration and avoid interference with pending litigation, Congress provided that the statutory definition would not become effective until January 1, 1940. House Conf. Rep. No. 1461, 76th Cong., 1st Sess., pp. 20, 21.

The material portion of definition thus added to the Act follows:

"The term 'agricultural labor' includes all service performed—

"(1) *On a farm,* in the employ of any person, in connection with cultivating the soil, or in connection with raising or harvesting any agricultural or horticultural commodity * * *.

"(2) In the employ of the owner or tenant or other operator of a farm, in connection with the operation, management, con-

servation, improvement, or maintenance of such farm \* \* \* if the major part of such service is performed *on a farm.*

\* \* \* \* \* \*

"(4) In handling, planting, drying, packing, packaging, processing, freezing, grading, storing, or delivering to storage or *to market* or to a carrier for transportation *to market,* any agricultural or horticultural commodity; *but only* if such service is performed as an incident to ordinary farming operations or, in the case of fruits and vegetables, as an incident to the preparation of such fruits or vegetables *for market. The provisions of this paragraph shall not be deemed to be applicable with respect to service performed in connection with commercial canning or commercial freezing or in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption."* [53 Stat. 1373, 42 U.S.C.A. § 409(1); 26 U.S.C.A. Int.Rev.Code, § 1426 (h), § 1607(1), emphasis added.]

Concededly, Burger's work of feeding a mechanical processor in the fruit packing plant of the Rosenberg Company was not "agricultural labor" prior to enactment of the legislative definition just quoted. So the precise question here is whether or not this amendment, specifically paragraph (4) thereof, broadened the content of the term to include what Burger was doing.

The first clause of paragraph (4) of the amendment broadly states that the agricultural-labor exemption shall apply to all service performed "in handling, planting, drying, packing, packaging, processing, freezing, grading, storing, or delivering to storage or to market or to a carrier for transportation to market, any agricultural or horticultural commodity \* \* \*."

Immediately follows, however, the limiting proviso *"but only if* such service is performed [1] as an incident to ordinary farming operations or, [2] in the case of fruits and vegetables, as an incident to the *preparation* of such fruits or vegetables *for market."* (Emphasis added.)

Then follows the further proviso: "The provisions of this paragraph shall not be deemed to be applicable with respect to service performed [1] in connection with

*commercial canning* or *commercial freezing* or [2] in connection with *any* agricultural or horticultural commodity *after* its *delivery to a terminal market* for distribution for consumption." (Emphasis added.)

Thus did Congress attempt to put into effective words its intention to rectify the administrative interpretation of "agricultural labor," which had "resulted in the establishment of competitive advantages on the part of large farm operators to the detriment of the smaller ones." House Rep. No. 728, p. 51, Senate Rep. No. 734, p. 61, 76th Cong. 1st Sess.

The committee reports are clear that Congress did not intend to expand the agricultural-labor exemption beyond services which are "an integral part of farming activities." The reports on the 1939 amendment declared: "The present law exempts 'agricultural labor' without defining the term \* \* \* greater exactness should be given to the exception and \* \* \* it should be broadened to include as 'agricultural labor' certain services not at present exempt, as such services are an integral part of farming activities. \* \* \*" House Rep. No. 728, p. 51, Senate Rep. No. 734, p. 61, 76th Cong. 1st Sess.

■ Services performed in treating and handling an agricultural commodity after delivery to a terminal market for distribution for consumption unquestionably do not constitute an integral part of farming activities. And it is clear from the last sentence of paragraph (4) of the legislative definition that Congress did not intend to exempt such services as agricultural labor, even when performed for the account of the producer or grower.

■ This legislative intent is unambiguously expressed. "Delivery to a terminal market for distribution for consumption" is fixed by statute as a definitive boundary. Thus Congress has drawn a line of demarcation across the various pathways followed by agricultural and horticultural commodities in passing from producer to consumer, and has declared that once the commodity reaches the market, from which in ordinary course of trade it next goes into the channels of distribution for consumption, any service afterwards performed for any per-

son in treating or handling such commodity does not constitute "agricultural labor" within the meaning of the Act.

 The uncontradicted evidence presented to the Board discloses that along the producer-to-consumer route of dried fruit the Fresno packing plant of Rosenberg Brothers is a terminal market. The Company purchases from growers fruit which has been pitted and dried. This fruit is stored and as orders require, the Company packs, sells and delivers it to wholesale and retail outlets. Burger's services were the beginning step in the Rosenberg process of preparing dried fruit for "distribution for consumption."

 Since the admitted facts place the Rosenberg Fresno plant in the category of a terminal market for dried fruit and Burger's services were there performed in connection with the preparation of such fruit for distribution for consumption, the Board was bound by the undisputed record to hold that such services were performed after delivery of the fruit to such terminal market and hence, by legislative definition, did not constitute "agricultural labor." The Board therefore erred in holding that Burger's 1940 earnings were exempt from the coverage of the Act.

This conclusion is buttressed by an analysis of other provisions of paragraph (4) of the statutory definition of "agricultural labor" in light of the reasons prompting the legislation.

As explained by the Congressional committees:

"Paragraph (4) * * * extends the exemption to service (though not performed in the employ of the owner or tenant or other operator of a farm) performed in the handling, planting, freezing, grading, storing, or delivering to storage or to market or to a carrier for transportation to market, any agricultural or horticultural commodity, provided such service is performed as an incident to ordinary farming operations or, in the case of fruits and vegetables, as an incident to the preparation of fruits or vegetables for market. The provisions of the paragraph, however, do not extend to services performed in connection with com-

66 F.SUPP.—40

mercial canning or commercial freezing, nor to services performed in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption.

"The expression 'as an incident to ordinary farming operations' is, in general, intended to cover all services of the character described in the paragraph which are ordinarily performed by the employees of a farmer or by employees of a farmers' cooperative organization or group, as a prerequisite to the marketing, in its unmanufactured state, of any agricultural or horticultural commodity produced by such farmer or by the members of such organization or group. The expression also includes the delivery of such commodity to the place where, in the ordinary and natural course of the particular kind of farming operations involved, the commodity accumulates in storage for distribution into the usual channels of commerce and consumption. To the extent that such farmers, organizations, or groups, engage in the handling, etc. of commodities other than those of their own production or that of their members, such handling, etc., is not regarded as being carried on 'as an incident to ordinary farming operations.' * * *

"In the case of fruits and vegetables, however, * * * services performed in the handling, drying, packing, etc. of those commodities constitute 'agricultural labor' even though not performed as an incident to ordinary farming operations, provided they are rendered as an incident to the preparation of such fruits or vegetables for market. Under this portion of the paragraph, for example, services performed in the sorting, grading, or storing of fruits * * * as an incident to their preparation for market, will be excepted irrespective of whether performed in the employ of a farmer, a farmers' cooperative, or a commercial handler of such commodities." House Rep. No. 728, supra, pp. 52, 53, Senate Rep. No. 734, supra, pp. 63, 64, 76th Cong., 1st Sess., emphasis added.

It is significant that "services performed in the handling, drying, packing * * * sorting, grading, or storing of fruits" are the only services specifically mentioned in

the Congressional committee reports as constituting "agricultural labor" if performed as an incident to the preparation of fruit for market. For those are among the services which are normally performed by the average grower in the preparation of his dried fruit either for delivery to a cooperative or for sale to a commercial handler.

■ Along the producer-to-consumer course of a given commodity, the point where "agricultural labor" ceases prior to delivery to a terminal market must be determined without the aid of a precise designation by Congress as to which or, more accurately, whose "market" is meant by that word as employed three times in paragraph (4) of the definition. It is clear, however, that the purpose of the enactment was to broaden the administrative definition of "agricultural labor" so that every agricultural and horticultural commodity—whether produced by the large grower, by the member of a co-operative, or by the small nonmember—would enjoy like freedom from employment taxes up to the point where the commodity in the ordinary course of trade normally passes out of the hands of the producer or grower, and from that point forth must bear alike the burden of such taxes. When this purpose is given full effect, it seems equally clear that the "market" Congress meant is the "growers' market"—the place or point where and the time when the ordinary producer or grower of the commodity customarily parts with economic interest in its future form or destiny.

Up to that point, services performed by anyone for *the account of the grower or producer* stand exempt from employment taxes as being "agricultural labor." Beyond that point—beyond the normal market of the producer or grower—the commodity must bear the burden of the taxes, regardless of who owns it.

Applied to the case at bar, this interpretation of "market" means that in order to fall within the exempting provisions of paragraph (4) of the definition, Burger's services must have been performed *for the account of the grower,* regardless of whether performed *in the employ* of the grower

or a cooperative or a commercial handler, *and* must have been so performed as an incident to the preparation of the dried fruit for "market"—i.e. for sale or other disposition by the grower in the form and at the stage of processing in which such fruit is normally or customarily disposed of by the ordinary grower.

By either test, then, Burger's services were performed after sale and delivery of the dried fruit by the grower to "market" or to a "terminal market"; hence, after "agricultural labor" in connection with such dried fruit had ceased. Accordingly, the questioned 1940 payments for Burger's services should be treated as "wages" within the coverage of the Act.

This view of the "market" Congress had in mind is consistent with the explanatory regulations issued by the Social Security Board and the Treasury subsequent to enactment of the statutory definition in question. Social Security Board Rg. No. 3, Part 403.808(e) (2), Article 808(e) (2), Title 20 C.F.R. (1940 Supp.); Treasury Rg. 106, Part 402.208(e) (2), Article 208(e) (2), Title 26 C.F.R. (1940 Supp.); Treasury Rg. 107, Part 403.208(e) (2), Article 208(e) (2), Title 26 C.F.R. (1940 Supp.).

Still other considerations reason the soundness of this result.

■ It is settled that the Social Security Act should be liberally construed in favor of those seeking its benefits. All doubts of interpretation are to be resolved in favor of coverage. Helvering v. Davis, 1937, 301 U.S. 619, 640–645, 57 S.Ct. 904, 81 L.Ed. 1307, 109 A.L.R. 1319; Grace v. Magruder, 1945, 80 U.S.App.D.C. 53, 148 F.2d 679; Carroll v. Social Security Board, 7 Cir., 1942, 128 F.2d 876, 881.

As Judge McCormick pointed out in Latimer v. United States, supra, "a realistic approach to the social and economic security of employees in present-day large scale enterprises of all kinds requires that all doubt in construing remedial statutes providing unemployment insurance and old age protection and containing tax impositions should favor coverage rather than exemption. * * * Revenue raising is not the sole purpose in such legislation and

the rule of strict construction in favor of the taxpayer is not applicable." 52 F.Supp. at page 234. Cf. North Whittier Heights Citrus Ass'n v. National Labor Relations Board, 9 Cir., 1940, 109 F.2d 76; National Labor Relations Board v. Tovrea Packing Co., 9 Cir., 1940, 111 F.2d 626; Idaho Potato Growers v. National Labor Relations Board, 9 Cir., 1944, 144 F.2d 295.

Furthermore, to borrow again the apt language of my learned colleague in Latimer v. United States, supra: "The principal reason for exempting 'agricultural labor' from social and industrial benefits resulting from remedial legislation has been administrative difficulties and accounting inconveniences in farm work, but with relation to employment in and operation and management of packing houses * * * no such impediment exists. On the contrary, the efficiency, economy and skill with which such units * * * are operated by boards of directors and expert business managers complemented with systematic office service entirely removes administrative difficulties of any kind as a barrier to the application of Social Security legislation in * * * packing house activities." 52 F.Supp. 228 at page 231.

Likewise here, as the record clearly reveals, the very factors which have been relied upon as constitutional justification for the "agricultural labor" exemption are entirely wanting. Carmichael v. Southern Coal & Coke Co., 1937, 301 U.S. 495, 513, 57 S.Ct. 868, 81 L.Ed. 1245, 109 A.L.R. 1327.

To construe the 1939 amendment so as to exempt the packing house activities of the Rosenberg Company in processing for its sole account fruit grown by others and sold to it as a commercial packer would be repugnant to the body of the Act and would work an exemption of doubtful validity. Such a construction should of course be avoided whenever reasonably possible. The Dollar Savings Bank v. United States, 1874, 19 Wall. 227, 86 U.S. 227, 236, 22 L. Ed. 80; Panama R. Co. v. Johnson, 1924, 264 U.S. 375, 390, 44 S.Ct. 391, 68 L.Ed. 748; Anniston Mfg. Co. v. Davis, 1937, 301 U.S. 337, 351, 352, 57 S.Ct. 816, 81 L. Ed. 1143; United States v. Yount, D.C.Pa., 1920, 267 F. 861.

All properly cognizable indicia point to a construction of the legislative definition which will operate to exempt as "agricultural labor" all service performed for the account of the producer or grower in connection with (1) the production or raising and harvesting of any agricultural or horticultural commodity and (2) preparation of the commodity for and delivery to a producers' or growers' market in the form or condition in which such commodity is customarily sold or disposed of by the ordinary producer or grower thereof, regardless of whether such exempted service be performed by an employee of the producer or grower, or by an employee of a cooperative of which the producer or grower is a member, or by an employee of a commercial handler rendering such service for the account of the producer or grower.

The results reached in Claim of Lazarus, 268 App.Div. 542, 52 N.Y.S.2d 682, affirmed, 1945, 294 N.Y. 613, 64 N.E.2d 169, and in Michigan Unemployment Compensation Commission v. Unionville Milling Co., 1946, 313 Mich. 292, 21 N.W.2d 135 (Cf. Minor Walton Bean Co. v. Michigan Unemployment Compensation Commission, 1944, 308 Mich. 636, 14 N.W.2d 524), are not inconsistent with the conclusion here. Those decisions hold exempt as "agricultural labor" the services of processors in cleaning beans *for the account of the grower* as an essential incident to preparation of such beans for the growers' market. "The sale by grower to employer was of beans *after* they were cleaned. * * * The beans were not marketable until *after* the service rendered by the claimants had been performed, the cost of which was borne by the grower." In re Lazarus, supra, 64 N.E.2d at page 170. Until cleaned, the beans are not prepared for delivery to a "terminal market" or any market. Michigan, etc., Commission v. Unionville Milling Co., supra, 21 N.W.2d at page 138.

By way of contrast, growers selling to Rosenberg's Fresno packing plant find that for dried fruit the "terminal market" and the growers' market are one. The serv-

ices of employees like Burger are performed not for the account of any grower, but for the sole account of a commercial handler engaged in the middleman business of placing the dried fruit in channels of "distribution for consumption."

The decision of the Social Security Board under review observes that "It was the purpose of the 1939 Amendment to clarify the agricultural labor exemption and to include therein certain services which had not been held exempt under the original Act but which were regarded as 'an integral part of farming activities'."

The Board then proceeds to determine, as a matter of law, "that Congress intended that services, such as were performed by the claimant in the instant case, are to be considered 'agricultural labor' irrespective of the fact that the services were rendered for a commercial handler of fruit [in which the grower had parted with all interest] and that the fruit, which it was the claimant's duty to empty from boxes or sacks into mechanical grading and processing machines, was ordinarily purchased by the claimant's employer from growers."

■ The Board's decisions interpreting the Act and regulations are entitled to great weight. United States v. Lalone, 9 Cir., 1945, 152 F.2d 43; Walker v. Altmeyer, 2 Cir., 1943, 137 F.2d 531; Social Security Board v. Warren, 8 Cir., 1944, 142 F.2d 974; Gray v. Powell, 1941, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301.

■ Plaintiffs concede this, but contend "that the applicable statutes and regulations properly interpreted forbid the method of calculation followed" by the Board.

This claim presents "a clear-cut question of law and is for decision by the Courts." Dobson v. Commissioner of Internal Revenue, 1943, 320 U.S. 489, 491, 64 S.Ct. 239, 242, 88 L.Ed. 248, cf. Bowles v. Seminole Rock & Sand Co., 1945, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700. As the Supreme Court recently put it, upon determining that "back pay" granted an employee under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., should be treated as "wages" under the Social Security Act: "Administrative determinations must have a basis in law and must be within the granted authority. * * * An agency may not finally decide the limits of its statutory power. That is a judicial function. * * * the Board's interpretation of this statute to exclude back pay goes beyond the boundaries of administrative routine and the statutory limits. This is a ruling which excludes from the ambit of the Social Security Act payments which we think were included by Congress. It is beyond the permissible limits of administrative interpretation." Social Security Board v. Nierotko, 66 S.Ct. 637, 643, decided Feb. 25, 1946.

For the reasons stated I hold that the Board's decision was contrary to law in refusing to recompute the monthly benefits payable to plaintiffs under the Act on the basis of additional payments made to plaintiff James F. Burger for services performed for Rosenberg Brothers and Company during 1940.

Accordingly, defendant's motion for summary judgment is denied, plaintiffs' motion for summary judgment is granted, and the decision of the Social Security Board dated May 4, 1945, is reversed and the cause remanded (42 U.S.C.A. § 405(g)) with directions to the Board to recompute the benefits to which plaintiffs are entitled under the Act, and in so doing to include the payments, amounting to $265.71, made to plaintiff James F. Burger by Rosenberg Brothers and Company in the last two quarters of the year 1940 as part of his total wages used in determining the amount of his primary insurance benefits as provided in § 209 of the Act (42 U.S.C.A. § 409(e), (f)), and the amount of his wife's insurance benefits as provided in § 202 (42 U.S.C.A. § 402(b).

Counsel for plaintiffs will draft judgment for approval under local rule 7 within ten days.