**KENAN v. McGOWAN, Collector of Internal Revenue.**

Civil Action No. 2733.

District Court, W. D. New York.

Nov. 14, 1946.

Kenefick, Cooke, Mitchell, Bass & Letchworth, of Buffalo (Daniel G. Yorkey and Albert R. Mugel, both of Buffalo, of counsel), for plaintiff.

Douglas W. McGregor, Asst. Atty. Gen., and Andrew D. Sharpe and John P. Wenchel, Jr., Sp. Assts. to Atty. Gen. (George L. Grobe, U. S. Atty., and R. N. Kirchgraber, Asst. U. S. Atty., both of Buffalo, N. Y., of counsel), for defendant.

KNIGHT, District Judge.

Plaintiff owns Randleigh Farm, a breeding farm for Jersey cattle, located near Lockport, New York, comprising about 600 acres. On it he maintains about 200 head of cattle. He alleges that it is not a dairy farm but that he obtains milk and dairy products as by-products of his breeding operations and that these are sold either on the farm or through delivery to customers on one milk route and are superior to ordinary commercial milk and command a premium price; that it is impracticable to sell them at wholesale; that his only practical alternative to disposing of the milk as waste is to sell it and the dairy products

on the farm and milk route. Plaintiff claims that the milk and dairy products are merely incidental to his main business of operating the breeding farm.

Defendant, over plaintiff's protest, exacted and collected from him $666.62 as taxes for the period from January 31, 1937, to March 31, 1945, under Sections 801 and 804 of Title VIII of the Social Security Act, 42 U.S.C.A. §§ 1001, 1004, and under Sections 1400 and 1410 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, §§ 1400, 1410, together with $166.79 penalties and $160.10 interest. Defendant likewise collected $25.52 as taxes for the period from April 1, 1945, to June 30, 1945, under Sections 1400 and 1410 of the Internal Revenue Code.

Plaintiff, after making said payments, now demands judgment for their sum, amounting to $1,019.03. He claims that the taxes were unlawfully collected because his employees, on account of whom the taxes were levied, performed agricultural labor.

The decision of this case turns on the nature of the employment of said employees and the meaning of the term "agricultural labor."

The employees involved in the imposition of the taxes are Wendell Bennett, George A. Clayton, Delia Groff, Charles Reid, Carleton Sparks and Dorothy Wendler Glynn.

At the trial on July 17, 1946, the only witness who testified was Torrence E. Grow, manager of the Randleigh Farm, who testified on behalf of the plaintiff. He employed each of the said six employees and gave the following testimony regarding the nature of their employment:

*Wendell Bennett:* "His work is in connection with the dairy, that is, he is the man that operates this milking machine, milks the five cows at once. * * * He also washes the bottles, bottles (the milk) and washes the pans and pails and other things used in the dairy * * *. * * * for several years in his spare time, which is in the afternoon, he has worked on the farm like in haying, and things like that, regular farm work. * * * He has worked on the farm since January 1st, 1937 * * *. He lives right there at the farm in one of the farm houses."

*George A. Clayton:* "He makes the ice cream. He makes the cottage cheese. He brings out the bottles of milk. Our milk is bottled in the basement, and it has to be brought to the next floor at the counter. He brings up the milk and cream. He waits on trade at times, and he also works in maintenance work on the building, that is, cleaning the building, keeping it clean. He was employed as a barn man at first. He took care of some 25 or 30 head of cattle for several years, until there was an opening in this Dairy Inn, and he took that over * * * probably seven or eight years ago * * *. He lives in a house on the farm * * *."

*Delia Groff:* She came "about six or seven years ago." Before that "* * * she had never done anything of that kind. She had worked in a home. * * * we trained her there at the farm." "* * * Miss Groff totals the amount of milk or cream for the month and figures the amount of money that is due the farm from this particular customer for that month. * * * Miss Groff makes out (a milk bill) at the beginning of each month and mails to our monthly accounts on the milk routes." "Sometime during the month she keeps those figures on those cards. This is a yellow card. Each customer has one. Q. She simply copies those figures from the route sheet? A. That is right." "Bennett * * * as he milks the cows, he records the weight each day for each animal * * *. The weight of the milk * * *. Miss Groff adds these figures on the adding machine, and using the figures for the—that the tester from Cornell University has left with us during that month, the butter fat percentage, she multiplies the pounds of milk by the percentage of the butter fat to obtain the contents of butter fat that cow produced during that month for each animal. * * * After she has added the figures, the milk weights from the yellow sheet I had a moment ago, those figures are copied in the spaces for them on this sheet, and this is then sent to the American Jersey Cattle Club. * * * Miss Groff makes copies of those (pedigree sheets) on the farm for use in making sales. * * * She

types copies, things like that, pedigree, also types heading for the milk production sheets * * * she does not write the letters." *She is not a bookkeeper.* "Q. Is she a stenographer? A. No, sir. I would not say so. She is to a certain extent, but she is not successful at it." She does not keep records of plaintiff's employees. "Her work in the Dairy Inn, with the exception of cleaning up in the morning, is confined to counter work, that is, passing out milk, making milkshakes, selling ice cream." She waits on customers in the Dairy Inn. All her work is done on the farm.

*Charles Reid:* "He operated the milk route * * * but he never worked on the farm." He entered the Armed Services "quite early in the war."

*Carleton Sparks:* "He is the man that operates our milk route. * * * He loads the milk in the morning in our truck, takes it into town and delivers it at these various householders. * * * In the summer he works on the farm. Right now he is working haying in the afternoon after his milk is delivered."

*Dorothy Wendler Glynn:* "Her duties were exactly the same as those of Miss Groff now, things Miss Groff does now she did when she worked there." All her work was done on the farm.

Witness said that the work of all these employees was a normal incident of farming operations and necessary to such.

Witness further testified that on plaintiff's Randleigh Farm there were 7 houses and 6 barns and "a lot of smaller buildings"; that the barns are made to keep cattle in; that there are three different farms. "In the main farm we have this Dairy Inn * * * in addition to the regular dairy barn." There are normally about 18 or 19 employees "divided into several different groups * * * seven men that work on the farm, and seven working the barns taking care of the cattle. There is a repair man. A man that works in the dairy, milk route driver, and two people that work in * * * Dairy Inn (which) is built in connection with a place where we take care of the milk, and where we milk the cows. It has the observation room * * * for the purpose of allowing the public to see the cows milked, and * * * in this same room we sell products of the farm, such as milk and ice cream and various other things. * * * The farm is a pure bred Jersey farm for breeding Jersey cattle. * * * We sell the male calves, sold for breeding purposes and shipped all over the country. * * * The farm is 600 acres. * * * About 450 in crop land and about 150 in pasture." "Q. What crops do you grow? A. General farm crops * * * to feed cattle. * * * Q. Do you sell any of those crops? A. Very seldom. Practically the only crop we ever sell is when we have a surplus of wheat." The crops "are all used to feed the cattle. * * * We have approximately 100 milking cows and a hundred others. That counts calves, young stock and everything."

Witness then described the milking operations. "We run a retail milk route in Lockport and we also sell milk over this counter in the Dairy Inn * * * our driver takes this milk that the other man has bottled into Lockport every morning and delivers it to our customers, house to house in the town. * * * On the milk route we sell cream and butter when we have it, which is not often, and over the counter we sell cream and milk and cottage cheese when we have it, and ice cream, buttermilk sometimes—the general run of things that are produced on the farm. * * * We make what is known as a special raw milk. * * * It sells for two cents more than the standard milk" The wholesale sale of milk was discontinued about 15 years ago. Witness said that the income from the sale of milk and dairy products was more than that from the breeding operations and gave this reason— "because * * * all these years we have been breeding up a herd, and we still have just about reached our capacity as to milch cows now and thus far we have sold very few females. We have sold only bull calves. We occasionally have sold a female because she was not up to our standard. With 100 milking cows we naturally produced a lot of milk. The best of the season we produce a ton of milk a day, and that is the main source of revenue on the farm, milk and cream." At the

Dairy Inn soft drinks like coca-cola are sold but this brings in very little revenue—$8 to $9 a month in summertime. "It is kept mostly for the convenience of the help."

On cross-examination plaintiff's manager testified that plaintiff grew all the roughage but purchased several thousand dollars worth of feed a year, that he· sold a little wheat each year, that the number of milking cows had slightly increased; that they are about 400 families, who receive daily about 450 quarts; that income from Dairy Inn "would average better than $1,000 a month gross" and that from milk route "would be around $2,000 a month;" that "income·from breeding stock would be less than that from the Dairy Inn"; that total income from Dairy Inn and milk route "is much larger" than income from breeding; that plaintiff averages about 20 bull sales each year; that the cattle are advertised but not the milk.

Plaintiff contends that the work of the employees for whom the taxes were collected was "agricultural labor." Defendant urges: "The employees involved here did not perform their services 'in connection with the cultivation of the soil, the raising and harvesting of crops, or the raising, feeding or management of live stock.' * * * We do not claim that workers who cultivated the soil, harvested the crops and cared for and fed the live stock were not agricultural workers, but we empatically assert that those who worked in the dairy on its route and those who spent their time in work not peculiar to agriculture should not come within the exemption."

The period of service for which the taxes were collected under Sections 801 and 804 of Title VIII of Social Security Code and under Sections 1400 and 1410 of Internal Revenue Code is January 31, 1937, to March 31, 1945. The period for which the taxes were collected under the latter sections alone is April 1, 1945, to June 30, 1945. These sections deal with employees other than those of carriers. The Internal Revenue Code contained no definition of "agricultural labor" prior to the amendment of Section 1426, 26 U.S.C.A. Int.Rev. Code, § ·1426, which became effective on January 1, 1940. Before the amendment, the sections merely excepted "agricultural labor" without defining it. The Social Security Act did not define the term.

Speaking of the latter statute before the amendment, the court, in Stuart v. Kleck, 9 Cir., 129 F.2d 400, 402, 403, said:

"The statute expressly excepts 'agricultural labor,' but does not expand the term in any detail. When the Congress, in providing for an exemption from the provisions of the Act, made use of the broad term 'agricultural labor', this expression, used by itself, must be given a meaning wide enough to include agricultural labor of any kind, as generally understood throughout the United States."

The court then adopts the definition of "agriculture" found in Webster's New International Dictionary, which states that, in its broad sense, it includes dairying.

It appears that plaintiff operates both a stock and a dairy farm. The term "farm" as used in 26 U.S.C.A. Int.Rev.Code, § 1426 (h) includes both. "(4) As used in this subsection, the term 'farm' includes stock, dairy * * * farms." Although plaintiff alleges that his Randleigh Farm is a breeding and not a dairy farm, the evidence discloses that his larger profit comes from his dairy operations. In this action, it may be so treated. Defendant urges that the amendment of 1940 is applicable only to employment after its effective date, which is January 1, 1940, and cites Chester C. Fosgate Co. v. United States, 5 Cir., 125 F.2d 775, certiorari denied 317 U.S. 639, 63 S.Ct. 31, 87 L.Ed. 515. This distinction will be borne in mind in discussing the cases hereafter cited.

In Jones v. Gaylord Guernsey Farms, 10 Cir., 128 F.2d 1008, taxpayer claimed a refund of Social Security taxes paid for the years 1936, 1937, 1938 and 1939. The court said:

"During the years in question he owned a herd of two hundred seventy-five dairy cows, which produced approximately 300 gallons of milk per day. The milk was cooled and bottled on the farm. Part of it was processed into cream, buttermilk and cottage cheese. All of these products were sold to individuals, hotels and grocery

stores, both at wholesale and retail, and were delivered by trucks. Nothing was processed save what was produced on the farm, and no other products were marketed or sold. During the time in question, the taxpayer also raised blooded livestock for sale. This stock was exhibited at different fairs. The employees in question consist of two bottlers and coolers, four or more truck drivers, two or more carpenters, two showmen, a bookkeeper, and a stenographer.

"The coolers and bottlers lived on the farm. The truck drivers did not live on the farm, but came early in the morning and drove the loaded trucks to the city and sold and delivered the milk products and collected therefor. The carpenters did not live on the farm. Their duties consisted of building and repairing sheds and fences, as well as doing repair work generally. They also did ordinary jobs around the farm when not otherwise engaged. The showmen's work consisted of preparing and conditioning the show cattle for exhibit. All their work, except when at a fair, was done on the farm. The stenographer worked in the taxpayer's office in town and devoted part of her time to work not connected with the farm. Her work in connection with the farm consisted in attending to registration of cattle, answering telephones concerning milk orders, and work of that nature. The bookkeeper kept the records and accounts pertaining to the operation of the farm." Page 1010.

The court held:

"It is our conclusion that the bottlers and coolers, carpenters, truckmen, and the cattle showmen are exempt from the provisions of the act, but that the bookkeeper and stenographer are subject to its provisions." Page 1012.

As to the latter two the court said:

"We ordinarily think of a veterinary, a bookkeeper, an accountant, or a secretary, as one who, through special training, has become skilled in a trade, calling, or profession. Work performed by them for a farmer does not constitute farm labor nor make of them farm laborers as we understand those terms, or as they are used in the act and in the regulation promulgated pursuant thereto." Page 1011.

In the instant case, Delia Groff was not a bookkeeper. She apparently knew a little stenography but was not successful at it. Her duties were all performed on the farm, in plaintiff's Dairy Inn, and consisted in selling goods over the counter and performing clerical work requiring no special skill and training.

In Larson v. Ives Dairy Co., 5 Cir., 154 F.2d 701, taxpayer claimed a refund of Social Security taxes paid for the years 1938 and 1939. Taxpayer operated a dairy business. "The milk and cream sold was pasteurized on the premises and bottled. * * * The truck drivers delivered the bottled milk and cream and collected for it. When not so engaged they did other work about the dairy. The office force did only clerical work in keeping records and accounts of the operations of the business." Page 702. The court held that the employees engaged in processing, packaging and transporting milk and cream to market were doing "agricultural labor" but that the clerical workers were not. The court said:

"The size of the farm (900 acres with 700 head of cattle), of course, does not matter—it is still a dairy farm. Nor does the fact that the producer elects to sell the product direct to consumers instead of to some middleman." Page 702.

The court further said:

"The purchase of some milk to supply customers in a season of great demand, which apparently was mingled with the milk produced, does not we think suffice to turn it into a commercial business." Page 702.

The pertinent parts of the 1939 amendment of 26 U.S.C.A. Int.Rev.Code, § 1426 (h), effective on January 1, 1940, read as follows:

"(h) Agricultural labor. The term 'agricultural labor' includes all services performed—

"(1) On a farm, in the employ of any person, in connection with cultivating the soil, or in connection with raising or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training, and management of livestock. * * *

"(2) In the employ of the owner * * * of a farm, in connection with the operation, management, conservation, improvement, or maintenance of such farm and its tools and equipment * * * if the major part of such service is performed on a farm. * * *

"(4) In * * * delivering to storage or to market or to a carrier for transportation to market, any agricultural or horticultural commodity; but only if such service is performed as an incident to ordinary farming operations * * *."

In Birmingham v. Rucker's Imperial Breeding Farm of Ottumwa, Iowa, 8 Cir., 152 F.2d 837, taxpayer claimed a refund of Social Security taxes paid "during the period January 1, 1940, through September 30, 1943, with respect to the wages of essential employees not engaged in the physical process of the hatching of poultry." Page 837. Some of the employees were employed in "working in the office writing and receiving orders and letters concerning orders for chicks, making out shipping tags and directions, answering the telephone, keeping books, and in executive capacities conducting and promoting the hatchery business and superintending the help therein." Page 838. The court said:

"Each of these employees renders services in connection with the hatching of poultry necessary to the taxpayer's business, without which it could not be carried on. It is fully as necessary to the operation of taxpayer's hatchery that the orders be received and billed out and the chickens sold and removed from the hatchery as it is to put the eggs into the incubator or to take the chicks therefrom." Page 838.

Judgment for the plaintiff taxpayer was affirmed. See also Navar v. United States, D.C., 62 F.Supp. 344; Chester C. Fosgate Co. v. United States, 5 Cir., 125 F.2d 775; United States v. Turner Turpentine Co., 5 Cir., 111 F.2d 400; Lake Region Packing Ass'n v. United States, 5 Cir., 146 F.2d 157; Latimer v. United States, D.C., 52 F. Supp. 228.

Defendant urges that this decision "must be restricted solely to employees of poultry hatching establishments." The court in its opinion, however, did not make any such restriction. It based its decision on the phrase "in connection with" contained in the 1939 amendment. Page 840 of 152 F.2d.

Further, this view is directly contrary to the position of the Internal Revenue Bureau, as recently set forth in two bulletins. Em.T.—Coll.No.6046, August 1, 1946, and Em.T.—Mim.Coll.No.6056. In the first of these, referring to the Rucker case, it is said: "and the views of the court have been accepted as establishing the controlling principle to be applied in similar cases." The other bulletin ruled that all services essential to the operation of a cotton gin establishment, including clerical services performed after December 31, 1939, constitute "agricultural labor."

Some 18 or 19 men normally were employed on plaintiff's farm. No question seems to have been raised as to any except those hereinbefore named. If the work done by the six was work not incident to ordinary farming operation "as distinguished from manufacturing or commercial operation," the same thing applies to the other workmen. Whether they were engaged plowing the land, caring for and taking in the crops or milking the cows, if this was a "manufacturing or commercial operation," they played a part in it. The nature of the operation is not to be determined by its size. Selling milk at retail is no less "agricultural labor" than selling in bulk to some distributor or manufacturer of milk products.

The defendant invokes the rule that an "exemption" is to be narrowly construed and cites a number of cases in his support. The limitation to this rule is well stated in the Rucker case as follows: "The rule requiring that a statute be strictly construed is not violated by allowing the statutory language to have its full meaning when that supports the policy and purposes of the statute." While there seems to have been some doubt as to the exact scope of "agricultural labor" as included in the exemption provision prior to the Act of 1939, it is swept away both by the language of the amendment and by the purpose and meaning of these words as expressed in the Committee reports in Congress.

In the case at bar, it appears that plaintiff's six employees performed "agricultural labor" both before and after January 1, 1940. Delia Groff and her predecessor Mrs. Glynn were not bookkeepers. They were apparently not trained stenographers. While they performed some clerical work, they were kept busy selling dairy products over the counter at plaintiff's Dairy Inn. This counter business averaged "better than $1,000 a month gross." They can not be regarded as specialists, following a calling that required great skill and training.

For the reasons above stated judgment must be rendered in favor of the plaintiff taxpayer for the amounts demanded in his complaint.

Let findings be submitted in accord herewith.