In the Matter of the Claims of ADA E. LAZARUS, VERNA NEWELL, LEONA M. MORLEY, ALTHEA C. JACOBS, MARGARET L. COLEATES, ELIZABETH KINDELBERGER, CATHERINE C. SHIPMAN, BESSIE H. HARVEY, BLANCHE C. STAPE, OLIVE T. COON, MABEL M. PADDOCK, ELSIE L. BAGSHAW and EDITH B. KEY.

GEO. W. HAXTON & SON, INC., Appellant; EDWARD CORSI, as Industrial Commissioner of the State of New York, Respondent.

Third Department, December 29, 1944.

*Skivington & Skivington,* attorneys (*George J. Skivington* and *William P. Smith* of counsel), for appellant.

*Nathaniel L. Goldstein, Attorney-General* (*Wendell P. Brown, First Assistant Attorney-General, Francis R. Curran, Assistant Attorney-General,* of counsel), for respondent.

HEFFERNAN, J. The employer has appealed from a decision of the Unemployment Insurance Appeal Board, which affirmed a decision of an unemployment insurance referee, holding that the service rendered to the appellant by the thirteen claimants herein was not "agricultural labor" and that claimants are entitled to unemployment insurance benefits based upon their earnings in such employment.

The facts are undisputed. The sole issue is whether or not the services performed by the claimants as bean pickers for appellant constitute "agricultural labor" within the meaning of section 502 of the Unemployment Insurance Law. The pertinent provisions of that statute are "But for the purposes of this article, ' employment ' shall not include: (1) agricultural labor; * * * 11. The term ' agricultural labor ' includes all service performed * * * (4) In handling, planting, drying, packing, packaging, processing, freezing, grading, storing, or delivering to storage or to market or to a carrier for transportation to market, any agricultural or horticultural commodity; but only if such service is performed as an incident to farming operations or in the case of fruits and vegetables, as an incident to the preparation of such fruits and vegetables, for market. The provisions of this paragraph shall not be deemed to be applicable with respect to service performed in connection with commercial canning or commercial freezing or in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption." [See now § 511, subd. 6.]

It is the contention of the appellant that the bean picking service performed by the claimants upon the beans handled by

it falls within the intent of the clause of that section reading, " or in the case of fruits and vegetables, as an incident to the preparation of such fruits or vegetables for market ", and that therefore such service constitutes " agricultural labor " exempt from coverage under the Unemployment Insurance Law. The Appeal Board has held in substance that the Legislature in enacting this language into the section intended that the phrase, " preparation * * * for market " meant preparation for the farmer's market, and that in this case the farmer's market is the appellant, and, therefore the labor of its bean pickers is outside of the phrase, " agricultural labor ".

Appellant is engaged in the produce business, and in connection with that business processes beans at various plants where it maintains elevators throughout Western New York. It has nothing to do with the raising of the beans. It maintains eighteen or twenty structures, designated as bean elevators, situate in various towns and villages in Western New York. Each bean elevator is situated at a railroad siding and each is unconnected with any farm land. In each of these bean elevators it has installed appropriate machinery for removing culls from the dried beans. This machinery is owned by it and is set up in the " picking room " of the elevator. Claimants and other bean pickers similarly employed are furnished by the employer with separate bean picking belts. Each bean picker sits alongside of her belt and as the beans pass in front of her she picks out by hand the culls or other waste material which become the property of the employer and are resold by it.

The bean pickers are hired by appellant. Their work is seasonal in character and they are intermittently laid off and rehired throughout the calendar year. The appellant pays the bean pickers and supervises, directs and controls all of their activities, and those activities are concededly physically unconnected with the actual cultivation of the soil or the raising and maturing of the beans.

The number of appellant's employees average from 250 to 900. The number of employees engaged as " bean pickers ", as were these claimants, ranges from sixty to sixty-five. The remaining employees of appellant render services as truck drivers, elevator operators, managers, field men, office employees, and the other personnel necessary to perform duties incidental to appellant's business.

The dried beans with reference to which the claimants performed their services in the appellant's premises are transported to appellant's premises from the farms upon which they

were grown by trucks. About one half of these beans are delivered by the farmers in their own trucks, and the balance is delivered in the trucks of appellant, which are driven by appellant's employees. Where this trucking is done by appellant's trucks and employees, a charge for the same is made to the farmer. When the beans arrive at appellant's elevators it issues what is known as a " scale ticket " which bears the name of the farmer from whom the beans are purchased. A sample is then taken of this delivery of beans and a " sample pick " is then made. This sample pick determines the percentage of waste material which will result from the hand picking of this lot of beans, and when this percentage is determined the quantity in pounds of waste material which will result is computed, this quantity is deducted from the original weight of this lot of beans, and the resultant balance in number of pounds is multiplied by the price per pound previously agreed upon (the market price for hand picked beans). Appellant then determines the estimated costs of hand picking the beans, and the balance represents the amount of money actually paid over by the appellant to the grower. It may here be noted that under this method the farmer directly pays for the cost of picking these beans, that is, the wages of these claimants and those similarly employed. In some instances a farmer delivers quantities of beans to appellant's elevators before any contract to purchase them has been made. In these cases the beans are commingled with other beans owned by the employer and already in the elevator, and in some cases it may be several months after delivery before the beans are purchased by the employer, depending upon when the farmer decides to sell; this sale being at the prevailing market price at the time, and in the meantime these beans may have been hand picked. It should be borne in mind that the operation performed by the claimants in this case in no way changes the chemical or physical condition of the beans; that the result of the operation is merely to clean the beans into the condition required by the regulations of the United States Department of Agriculture before they can enter into distribution for consumption.

After hand picking, the beans are packed by appellant into one hundred pound bags, upon which appellant's name appears. Appellant finds a suitable market for them and resells them to canners and jobbers. It also sells the cull or unwanted beans to farmers as feed for hogs, cattle and chickens. Appellant's profit is the difference between the price paid by it to the farmers for the beans and the price at which it sells them, minus the

cost incidental to the operations conducted by appellant. Delivery to the canners and jobbers is made by railroad or common-carrier truck. The price at which appellant sells the product, and the consequent profit therefrom, are matters between appellant and its customers, and in which the farmers who grow the beans have no interest and take no part.

The Appeal Board has found that the beans could not be sold to the consumer in the form in which they are delivered to the appellant by the farmers. They must be hand picked under the rules issued by the Federal Department of Agriculture. They could not be shipped in State or interstate commerce without grading them.

In a few instances appellant stores beans, the title to which remains in the name of the farmer for the time being, but which are subsequently purchased by appellant, depending upon market conditions favorable to the farmer. These beans are commingled with the beans already purchased by appellant. In the case of the beans which are stored on appellant's premises, but ultimately purchased by appellant, the arrangements are substantially similar to those prevailing in cases where the beans are purchased from the farmer in the first instance. In rare instances, beans delivered by the farmers contain excessive moisture, which increases the weight of the beans, in which cases appellant dries the beans in kilns maintained by it in its elevators and computes the cost of such operation, which is deducted from the purchase prices of the beans.

It is quite obvious that the farmer does not sell his beans in the condition in which they come from the thresher, but that he sells them as choice hand picked. The beans do not become the finished farm product ready to enter into the ultimate consumer channels until the operations performed by these claimants have been completed. The farmer cannot get his beans into the finished farm product required for the consumptive market without this processing or hand picking for which he pays.

The question presented for decision is one of first impression. In construing the statute under consideration it is important to look into the history of the law with respect to the exemption of " agricultural labor " from the provisions of the Unemployment Insurance Law. The original New York State Unemployment Insurance Law was enacted by chapter 468 of the Laws of 1935 and became effective April 25, 1935. That Act in section 502 provided that employment shall not include " (1) *Employment as a farm laborer* ", and there was nothing else in that Act to throw any light on the question involved in this proceeding.

Prior to April 22, 1941, the Act was amended in a number of particulars not material here. In each of the amendments to be exempt the " farm laborer " must have been employed on a farm.

By chapter 669 of the Laws of 1941, effective April 22, 1941, the Legislature made a comprehensive re-enactment of the statute and for the first time it substituted the words " agricultural labor " for the words " employment as a farm laborer.". As revised the statute provides: " but for the purposes of this article, ' employment ' shall not include: (1) agricultural labor ".

It seems to us from the history of the statute that it was the legislative intent that " agricultural labor " was to include all labor in connection with the preparation of fruits or vegetables for market up to " *its delivery to a terminal market for distribution for consumption* ". This new subdivision 11 of section 502 as enacted by chapter 669 of the Laws of 1941 is copied verbatim from the Federal Insurance Contributions Act, now known as subchapter A of chapter 9 of the United States Internal Revenue Code (U. S. Code, tit. 26, § 1400 *et seq.*). That Federal Act, which came into existence as the " Social Security Act Amendments of 1939 ", became a Federal law on August 10, 1939, effective January 1, 1940.

The report of the Committee on Ways and Means to the United States House of Representatives, dated June 2, 1939, with reference to the Federal statute is conclusive that it was the legislative intent of the Congress to exempt from that act the class of labor involved in this appeal.

By section 1429 of the Federal Act (U. S. Code, tit. 26, § 1429) the Commissioner of Internal Revenue was given power to prescribe and publish rules and regulations for the enforcement of that Act.

The Commissioner thus adopted the same definition and interpretation of the statute contained in the committee report to the House of Representatives above cited.

The Federal Treasury Department under the Federal Act has determined that a bean processor such as the appellant in this case, and performing exactly the same activities and carrying on its operations in the same identical manner, is not subject to the Federal Act.

The appellant now occupies an anomalous status. It is exempt under the Federal Act but included in the State Act, the language in each case being identical.

While Federal statutes and decisions are not binding on us they are highly persuasive and uniformity in interpretation is desirable. (*People ex rel. Mosbacher* v. *Graves,* 254 App. Div. 438, affd. 279 N. Y. 793; *Matter of Bank of Richmondville* v. *Graves,* 259 App. Div. 4, affd. 284 N. Y. 671.)

It is clear that the work of picking beans done by appellant is part of the necessary processing before they are ready for consumption, and it should be noted that under the provisions of paragraph 4 above quoted, it is not necessary that this processing be an incident to ordinary farming since the definition reads in the alternative, that is, the processing can be performed as an incident to farming operations *or* incident to the preparation for market. It would appear immaterial that the beans might have been graded or picked by the farmer himself; if the farmer did not do it, the picking of the beans by the appellant in this case was still incident to the preparation for market.

The phrase used in the statute "as an incident to the preparation of such fruits or vegetables for market" raises the query, "what market?" It seems to us that the Legislature meant "a terminal market".

We are primarily concerned with the service rendered. The phrase "preparation for market" means the act of transforming the product from its raw and natural state into the prescribed packaged form so that it may be salable to the wholesaler, retailer and consumer.

The elevator is not a terminal market in the proper sense of the term. A terminal market is the place of business to which products are shipped in a sorted, graded, packaged condition, ready for immediate sale. If the product in the course of shipment reaches a warehouse in its raw or natural state, or partially sorted, but not yet fully processed and approved for public sale according to law, it is not yet prepared and ready for market; the intermediary warehouse, like the elevator, is not the "terminal" delivery point for such products. After the product has been further completely processed it is deemed prepared "for market" and then and then only is ready "for distribution for consumption".

The services performed by appellant, it seems to us, must be deemed to be "an incident to the preparation of such fruits or vegetables for market". Certainly the services performed by appellant are absolutely essential to the marketing of the beans.

We are convinced that the services performed by claimants constitute "agricultural labor" within the meaning of the statute and hence the decision appealed from should be reversed, with costs to appellant.

FOSTER, J. (dissenting). There is no dispute about the facts in this case. I am unable to agree, however, with the conclusions reached by Justice HEFFERNAN. The service rendered by claimants was not rendered as an incident to farm operations. Title to the beans had passed to the appellant corporation, which was engaged in a commercial enterprise entirely disassociated from any farm activity. When title passed from the farmers a terminal market had been reached insofar as they were concerned. If the term " terminal market " is to be defined as a " consumer market ", or a " retail market ", endless complications are almost certain to result. The produce buyer, such as the appellant here, may sell to a wholesaler, the latter to a jobber, and finally the jobber to a retailer. With various types of farm produce there may also be other steps of packing, packaging and processing taken by the various handlers besides those taken by the original buyer. Are all employees along the line of such handlers to be excluded from coverage on the ground that they are agricultural laborers? Concededly the line must be drawn somewhere, and it seems to me more logical and more consonant with the broad and basic purposes of the statute to draw it where the Industrial Commissioner has done, at the point where title has passed from the farmer. The scope of the Federal Act, of which the State Act is a duplicate, was enlarged, as I gather from congressional debates and reports, to remedy a situation where the farm co-operative associations were covered and individual farmers were not. Under that situation the large farmer was excluded, while the small farmers, operating in the form of co-operative associations because of necessity and economy, were covered. I can find no intent to exclude purely non-co-operative commercial firms. Obviously farm co-operatives are not in any sense involved in this case, and we are dealing with the employees of a purely commercial enterprise. For these reasons the decision of the Industrial Commissioner should be affirmed.

HILL, P. J., BLISS and BREWSTER, JJ., concur with HEFFERNAN, J.; FOSTER, J., dissents in a memorandum.

Decision reversed, with costs to appellant.