**EWING v. McLEAN.**

**No. 12523.**

United States Court of Appeals, Ninth Circuit.

June 7, 1951.

888

H. G. Morison, Asst. Atty. Gen., John A. Carver, U. S. Atty., Paul S. Boyd, Asst. U. S. Atty., Boise, Idaho (Edward H. Hickey, Irvin M. Gottlieb, Attys., Dept. of Justice, Leonard B. Zeisler, Atty., Fed. Security Agency, Washington, D. C., of counsel), for appellant.

S. T. Lowe, Burley, Idaho, for appellee.

Before STEPHENS, HEALY and BONE, Circuit Judges.

BONE, Circuit Judge.

Appellee, McLean a laborer, having attained the age of 65 years made formal application for certain claimed benefits accruing to him under the provisions of the Social Security Act, 42 U.S.C.A. § 301 et seq., hereafter called the Act. A hearing on his petition was held before a referee of the Social Security Board at which the referee considered and determined the question of "coverage" under the Act of the services rendered by appellee as an employee of Albert Miller and Company, an Illinois corporation which operated a commercial potato warehouse packing shed at Burley, Idaho.[1] (The terms Miller and "warehouse" when used in this opinion mean the Miller company or the warehouse owned and operated by it.) The referee's decision was adverse to appellee's claim. It was later reviewed by the Appeals Council of the Social Security Administration whose final decision sustaining the referee was challenged on a review in the lower court under the provisions of Section 405 (g) of Title 42 U.S.C.A.

Miller purchased potatoes from Idaho growers for the purpose of resale, either in interstate commerce or locally. The potatoes were transported to the warehouse where, after certain operations were performed in connection with them, they were sacked according to grade and then sold by Miller. The character of the work done by appellee at the warehouse in connection with the handling of these potatoes presents the problem here involved.

In his amended complaint appellee alleged (and the record shows) that the labor performed by him at the warehouse consisted of (a) feeding potatoes into a sorter and washer, (b) working on a sorting table, (c) removing bags from a sorting machine, and (d) assisting in loading railroad freight cars and trucks and other vehicles from the Miller warehouse. His wages were compensation for these services.

Among other matters the referee found, (a) that the warehouse where appellee per-

1. By reason of the employment of appellee for a period of 17 quarters prior to ceasing his employment. However, only that portion of appellee's somewhat intermittent labor performed for the Albert Miller concern during 1941 and 1942 is here involved.

formed his physical services was not a "terminal market" but was used by Miller primarily for the purpose of receiving and processing potatoes purchased from growers after which they were shipped to various buyers at other points in and out of Idaho where the potatoes "did ultimately reach their terminal market"; (b) that at out of state points the potatoes came into the hands of jobbers in carload lots and these "jobbers" distributed them to various retailers and dealers who in turn distributed them to the consuming public; (c) that title to the potatoes passed to Miller when they were purchased from the grower and thereafter and through all stages of warehouse operations title to the potatoes handled remained in Miller. (There is no finding in the case as to whether Miller *paid* for the potatoes before or after they were sorted and *graded.*)

In his decision the referee said:

"The record does not disclose exactly what percentage of the potatoes were sorted and graded in the farmer's cellar and what portion were sorted and graded in the company's warehouse, and it is not unreasonable to assume that approximately one-half of the potatoes handled were purchased and paid for on the basis of measurement or sorting and grading in the farmer's cellar, and the other half paid for on the basis of sorting and grading in the warehouse. Regardless of how they were purchased and paid for, they were all brought into the warehouse *for the purpose of further sorting and grading and washing.* The first function of the warehouse operation was to feed *all* of the potatoes through the washer, then to sort them into two grades above noted [U. S. No. 1 and U. S. No. 2] * * *.

\* \* \* \* \* \*

"* * * The farmer stores them in bulk without sorting or grading them. The

potatoes are not sorted or graded until they come into the hands of the [Miller] company. The company sorts and grades them either in the farmer's cellar *or* in its own warehouse after trucking the potatoes to its warehouse from the farms at its own expense. * * * It is evident from the facts in this case, and the referee finds that, potatoes handled by the company in its Burley warehouse were not fully prepared for market *until* they were washed and finally sorted and graded, and it is therefore the finding of this referee that the operations of the company in its Burley warehouse were incident to the preparation of potatoes for market." (The foregoing findings were adopted by the Appeals Council on review.) (The emphasis is ours.)

The referee expressed the view that the warehouse operations should be considered as "incident to the preparation of the potatoes for market" and that appellee's services "were *excepted* from employment" because they represented "agricultural labor." Therefore his salary should not be included in his wage records. On the review of this decision before the Appeals Council it pointed out that the facts caused the referee to rely on the provisions of Section 209(*l*)(4) of the Act since they *required* the conclusion that appellee's services for Miller were "excepted" by said statutory provision hence the services constituted "agricultural labor" not performed in a "terminal market" but only "as an incident to the preparation of such * * * vegetables for market." A contrary contention, says the Appeals Council, "constituted the issue" before it.

On review the Appeals Council permitted appellee to file certain additional evidence consisting of a letter from him, and three affidavits two of which discussed the character of the operations carried on in the Miller warehouse.[2] This evidence was of-

---

2. The two affidavits filed with the Appeals Council recited, inter alia, that approximately 40% of the potatoes purchased by Miller were sorted in the farmers' cellars "by and for" Albert Miller and Company and were (later) disposed of locally and in various intrastate sales; that the majority of the potatoes (so) sold and which had not been washed

nor sorted in the warehouse were sorted and graded in the farmers' cellar; that this 40% purchased from the growers and so sorted in their cellars, "were sold from the warehouse." Also that approximately 60% of the potatoes purchased by Miller were shipped to points outside of Idaho. From these recitals it

fered to establish that the warehouse was a "terminal market" for the potato grower. The Appeals Council states that appellee felt that the conclusion that the warehouse was a "terminal market" was required by the fact that this additional evidence showed that 40% of the potatoes purchased by Miller were sold "locally" rather than being shipped to wholesalers and dealers located at points outside Idaho for subsequent resale, as was the case with the other 60%. The Appeals Council (additionally) found that "the evidence received * * * subsequent to the referee's decision indicates * * * that *most* of the potatoes which were sold locally from the warehouse had been purchased from the growers, having ˙been *sorted* and *graded* in the growers' cellars and were not *washed* or *sorted* in the warehouse." Its decision states that appellee's additional evidence shows, and supports the conclusion, that (within the meaning of the Act) the so-called "distant points" to which 60% of the potatoes were shipped, rather than the Burley warehouse, really constituted the "terminal market" for the "output" of the warehouse.

A pointed reference is made to an aspect of the case which brings in the factor of percentages of potatoes handled and this is a phase of the case which is given vigorous accent by appellant. The Appeals Council states that: "If it is considered proper to consider the local sales made at Burley separately from the total, it would seem also that consideration should be given to the fact * * * that the services performed by the claimant, as stated in the referee's decision, 'consisted of approximately 45% in *washing* operations and 55% in *grading* operations *at* the Burley warehouse.' [3] Since the new evidence submitted by the claimant shows that neither of these operations was performed *in* the warehouse *respecting potatoes sold locally,* the conclusion would seem to be inevitable

that his services related solely to the potatoes (60% of the total handled) which were shipped directly or indirectly to wholesalers and dealers located at distant points [Note 2] from Burley, Idaho, and that his services, therefore, were performed *prior* to the delivery of the potatoes *to a terminal market,* and 'as an incident to the preparation of such * * * vegetables for market.' "

.The Appeals Council concluded that *as to the 40% sold locally* the services of appellee "were performed *prior* to the delivery of the potatoes to a terminal market and as an incident to the preparation of such * * * vegetables for market." It sums up its holding as follows: "It is the position of the Social Security Administration that the handling, packing, packaging, grading, and preparing of fresh fruits and fresh vegetables in their raw or natural state prior to the sale thereof, or delivery thereof for shipment or sale, to a wholesaler or dealer, in the employ of commercial handlers who purchase the fruits or vegetables from the producer, are excepted services is (sic) under section 209(*l*)(4) of the Act."

In its brief appellant asserts that the 40% of purchased potatoes sold locally *never entered the Miller warehouse.* As indicated, supra, the Appeals Council also adopted a finding by the referee which stated that: "regardless of how they were purchased and paid for, they were *all* brought into the warehouse for the purpose of further sorting and grading and washing. The first function of the warehouse operation was to feed *all* of the potatoes through the washer, then to sort them into two grades * * *".

On the point mentioned in the preceding paragraph reference is made to averments in the two affidavits mentioned in Note 2 that the 40% sorted in the farmers' cellars by Miller "were sold *from* the warehouse at Burley * * * to local produce com-

---

would appear that the above noted work performed in the farmers' cellars was done by the Miller Company before it removed the purchased potatoes to its warehouse.

3. We are of the view that the percentage

"allocations" of the time spent by appellee in working at different kinds of physical labor in or about the warehouse do not possess the importance or significance which the Appeals Council appears to attach to them.

panies, etc, and that these sales were "by the Burley warehouse." The only specific reference to this particular matter in the decision of the Appeals Council is the statement that the locally sold potatoes "were not washed or sorted in the warehouse." The lower court could believe this to be true and yet be free to accept as true the fact asserted in the affidavits that the same 40% were sold *from* the warehouse *by* Miller. Thus we have a clear and persuasive inference that the 40% also passed through and were handled and sold *at* the warehouse and the court could have rationally assumed and concluded that some part of appellee's labor at the warehouse was devoted to handling these same potatoes.

Because of appellant's emphasis upon the importance of this decision in the administration of the Act we have burdened this opinion by reciting in considerable detail

the record before the lower court.[4] On its review of the record the court entered an order denying appellant's motion for summary judgment and expressed therein the view that the rule approved by this court in Miller v. Burger, 9 Cir., 161 F.2d 992 was controlling. Its judgment reversed the decision of the Appeals Council and remanded the case to the Federal Security Administrator with directions to revise the wage records in the Administration with respect to appellee's wages so as to include the payments of salary received by appellee for his services at the Miller warehouse. This appeal is from that judgment and the order.

### Specifications of Error.

Appellant specifies many errors which reach into every area of the case[5] and we summarize them below in order to indicate the sweeping nature of the attack on the

4. The hearing of the lower court was had on the pleadings and a certified copy of the record of the case.

5. The court erred in failing to hold (1) that the labor of appellee was "agricultural labor," (2) that appellee's services were performed prior to delivery of the potatoes to a terminal market and as an incident to the preparation of such potatoes for market, (3) that the washing, sorting and grading operations performed by appellee at the warehouse were as an incident to the preparation of the potatoes for market within the meaning of Section 209(l)(4) of the Act and the meaning of Administration Regulation No. 3, Part 403, Title 20 C.F.R., Sec. 403.808(e), (4) that the Act makes no distinction between the farmer-growers of fresh vegetables and the commercial handlers thereof, insofar as the latter performs for such farmer-grower services incident to the preparation of such vegetables for market (a) thereby nullifying the exception of services such as washing, sorting, and grading, incident to the preparation of vegetables for market, without regard to the Congressional purpose as established by the legislative history of the 1939 amendments to the Act and to the respect due the expertness of the Administrator, and (b) invalidating the regulations promulgated by the Administration.

Other errors specified are that the court improperly held (1) that the ware-

house was a terminal market for distribution for consumption, (2) that appellee's services were performed after the potatoes had reached the (a) growers' market or (b) the terminal market, (3) that the decision in the Miller-Burger case, supra, is controlling here where the washing, sorting and grading work done by appellee was incident to the preparation of the potatoes for market and was necessarily performed by appellee as the statutory agent of the grower prior to completion of which operations title to the potatoes remained in the farmer grower, (4) that Miller was not the statutory agent of the farmer grower for the performance of the washing, sorting and grading operations.

Remaining contentions are (1) that the court substituted its own views of "agricultural labor," for the statutory definition adopted by Congress for Title II of the Act and corresponding tax provisions, (2) disregarded the Administrator's finding and finding independently (this contention is not supported if it suggests a formal finding by the court since none appears in the record) and without support in the record that when the warehouse received the unwashed, unsorted and ungraded potatoes they were then in a merchantable state and that the farmer growers had parted with all economic interest and title therein, (3) it was error to deny appellant's motion for summary judgment and to reverse and remand the cause.

judgment. Whatever their collective significance appellant boils down its attack to a basic issue posed as follows: "The issue in this case is whether, under the circumstances * * * the services performed [by appellee] * * * at its warehouse * * * were services performed in the handling and grading of potatoes as an incident to their preparation for market and before their delivery to a terminal market for distribution for consumption."

In this posture of the case we agree that our decision in Miller v. Burger, supra, is a barrier to acceptance of the theory advanced by appellant as a reason for reversal in this case. The Burger case involved a fact situation which in many important respects is akin to that in the instant case. Appellant sees differences but its argument on this point is not persuasive. (See the Burger decision reported in the lower court as Burger v. Social Security Board, D.C., 66 F.Supp. 619.) After a painstaking analysis of cases from this and other courts and of the law applicable to the facts, District Judge Mathes there sustained claims to benefits under the Act. Reserving judgment on one point, another district court of this Circuit in Bettencourt v. Social Security Board, D.C., 66 F.Supp. 629 expressed full agreement with the reasoning and conclusions of Judge Mathes in the Burger case. The rule was again applied in Baiocchi v. Ewing, D.C., 87 F.Supp. 520. We call attention to our decision in Idaho Potato Growers, Inc., et al v. National Labor Relations Board, 9 Cir., 144 F.2d 295 (certiorari denied November 6, 1944, 323 U.S. 769, 65 S.Ct. 122, 89 L.Ed. 615) which has a significant bearing on the specific issue before us. (See concurrence by Judge Fee in this case.) The attitude of this court, as expressed in the Burger case, was not a departure from principles previously supported by us. Our position in dealing with an issue closely allied in principle to that we here confront was well

stated by Judge Stephens in North Whittier Heights Citrus Ass'n v. National Labor Relations Board, 9 Cir., 109 F.2d 76 and National Labor Relations Board v. Tovrea Packing Co., 9 Cir., 111 F.2d 626.

■ The cases noted in the preceding paragraph add emphasis to the frequently quoted admonition of Judge McCormick in Latimer v. United States, D.C., 52 F. Supp. 228 to the effect that courts should resolve doubts in construing remedial legislation providing unemployment insurance and old age protection in favor of coverage rather than exemption.[6] This concept has been reflected in the subsequent decisions of this and other courts of this Circuit.

The rule announced by this court in the Burger decision, supra, is vigorously assailed by appellant. It contends that in this decision we approve an untenable theory of law and our duty is to overrule the case. We cannot agree with appellant's conclusion. We do not find in the facts in the instant case so complete a departure from those shown in the Burger case as to justify departure from the rule we there announced, and we adhere to it in this case. Nor can we agree that the court below should have held, as a matter of law, that under the facts in this case the employer of appellee acted as agent for the farmer-growers, and that title to the potatoes handled through the warehouse did not pass until the warehouse services performed by appellee had been performed.[7]

Appellant argues that the potatoes bought by Miller were delivered to Miller in their natural state and could not be readied for distribution to the consuming public *prior* to being washed, sorted and graded; that the physical tasks here performed by appellee for an employer in a purely commercial operation for private profit must, as a matter of law, be held to be services which appellant defines as those: "generally performed as field activities on a farm

6. See comments on our Burger decision in Producers' Crop Improvement Ass'n v. Dellman, 7 Cir., 178 F.2d 66.

7. Appellant contends that it is immaterial whether title to the potatoes handled (by Miller) passed to Miller before or

after they were sorted and graded by Miller nor is it material at what time or place or in what condition the ordinary grower customarily parts with his economic interest in his potatoes.

in connection with and immediately following and closely related to growing and harvesting * * * they are 'farm activities' and constitute an integral part of farming operations."

We do not agree with the theory expressed in the preceding paragraph—we disagree for reasons made plain in the two Burger cases. A practical appraisal of realities is here required, and the yardstick of the law does not require the result for which appellant contends. We think that so far as concerns the farmer-grower of potatoes the Miller warehouse was, in law and in fact, the "terminal market" for his product and was the point and place where he parted with his economic interest therein. If this view is unsound it would be difficult, if not impossible, to eliminate from the sweep of the Act most, if not all, of the many purely commercial private ventures operating under business practices like those employed by the Miller concern. We are convinced that the law does not require such a result.

The lower court did not err in applying the rule of the Burger case. There was substantial evidence in the record to support its disposition of the issue before it and its order and judgment should be and they are affirmed.