In the Matter of Savoy Ballroom Corp., Appellant. Isadore Lubin, as Industrial Commissioner, Respondent.

Third Department, November 23, 1955.

*Louis B. Stillman* and *Martin R. Levine* for appellant.

*Jacob K. Javits, Attorney-General (Francis R. Curran* and *James O. Moore, Jr.,* of counsel), for respondent.

HALPERN, J. This case brings up for review the unfortunate conflict which has developed between the Federal and State authorities with respect to liability for unemployment insurance contributions upon the compensation paid to members of so-called " name " bands.

The proprietor of a public dance hall or ballroom customarily enters into a contract with the leader of the orchestra under a standard form contract prescribed by the American Federation of Musicians known as form B. This contract was promulgated by the union after the Federal courts had held that, under the form of contract theretofore used, the leader of the band was the employer and was liable for social security taxes on the salaries paid to the members of the band (*Spillson* v. *Smith,* 147 F. 2d 727; *Williams* v. *United States,* 126 F. 2d 129; *Biltgen* v. *Reynolds,* 58 F. Supp. 909; *Los Angeles Athletic Club* v. *United States,* 54 F. Supp. 702; *Aberdeen Aerie No. 24 F. O. E.* v. *United States,* 50 F. Supp. 734; *Matter of Ten Eyck Co.,* 41 F. Supp. 375). The form B contract was concededly designed to make it appear that the dance hall or ballroom operator was the employer, so that he would be the one held liable for social security taxes and unemployment insurance contributions. The contract applied the designation of " employer " to the operator and it contained the provision that " The employer shall at all times have complete control of the services which the employees will render under the specifications of this contract ".

The actual realities of the situation were, however, as shown by the record in this case and by the record in *Bartels* v. *Birmingham* (332 U. S. 126, *infra*), that the leader was the owner of

an independent enterprise and that he chose the members of the band and replaced them from time to time in accordance with his own wishes. The contracts usually called for the payment to the leader of a fixed sum either as a complete payment or as a guarantee against a share of the gross receipts. The leader paid the weekly salaries of the members of the band, in accordance with the union scale, and retained, as his profit, the difference between the contract price and the total compensation paid and incidental expenses. The leader usually entered into a number of short-term engagements with different dance hall or ballroom operators; the relations between the leader and the other members of the band were fairly permanent; those between the band and the operator were transient (*Bartels* v. *Birmingham*, 332 U. S. 126). In order to reconcile the contract designation of the operator as the employer with the actual realities, the contract provided that, in employing the musicians and in distributing their pay to them, the leader acted as the agent of the operator.

After the adoption of the form B contract, the Commissioner of Internal Revenue issued interpretive rulings in 1944 holding that, under the contract, the ballroom operator was to be regarded as the employer for Federal social security and unemployment insurance tax purposes (Internal Revenue Bulletin [Cum. Bulletin, 1944], pp. 547, 548). However, on June 23, 1947, the United States Supreme Court held that these rulings were erroneous and that, notwithstanding the terms of the contract, the orchestra leader was not the employee of the operator but was an independent contractor and that he was the actual employer of the members of the band. The court held that the leader was liable for Federal social security and unemployment insurance taxes and that the parties could not by contract shift the tax liability from the leader to the ballroom operator (*Bartels* v. *Birmingham, supra*).

In the meantime, the question of liability for unemployment insurance contributions under the New York Unemployment Insurance Law (Labor Law, art. 18) had arisen in New York State. The New York Unemployment Insurance Appeal Board had held, even under the contracts used before the adoption of the form B contract, that, since the contracts had incorporated by reference the union by-laws which designated the operator as the employer and the leader as his agent, the operator was liable for unemployment insurance contributions under the New York law. The courts sustained these decisions of the board

(*Matter of Camgros* [*Miller*], 264 App. Div. 973, affd. in part 290 N. Y. 838; *Matter of Roseland Amusement Co.* [*Corsi*], 269 App. Div. 713, affd. 295 N. Y. 913; but compare *Matter of Earle* [*Hunstay Operating Corp.-Miller*], 262 App. Div. 789, affd. 286 N. Y. 610).

The first case to reach the courts under the form B contract was *Matter of Hotels Statler Co.* [*Corsi*] (279 App. Div. 814 [Jan. 1952]; motion for leave to appeal denied 304 N. Y. 987). That case arose after the decision by the United States Supreme Court in the *Bartels* case. The referee in the *Statler* case held that, notwithstanding the decision by the Supreme Court, the contract provision vesting the right to control in the operator, designated in the contract as the employer, was sufficient in and of itself to make the operator liable for unemployment insurance contributions. He declined to follow the Supreme Court's decision upon the ground that the question was one of State law and that the Supreme Court's decision had no binding force. The appeal board affirmed the referee's decision but added a finding that the hotel had, in fact, exercised control over the performance by the musicians during the period of the contract. Upon appeal to this court, the court did not approve the broad position taken by the referee (and affirmed by the board) but it nevertheless affirmed the board's decision upon the ground that it was " within the realm of fact ". The decision of the appeal board was " final on all questions of fact " (Labor Law, § 623) and, if the decision was supported by substantial evidence, the court was powerless to disturb it. The court pointed out that " There is some evidence of rather trifling acts of control on the part of the management of the hotels where the orchestras played ". The court noted that the board had not " made any attempt realistically to appraise the relationship in the light of common-law principles, as was done in the case of *Bartels* v. *Birmingham* (332 U. S. 126) " but it nevertheless held that the board had the power to decide as a matter of fact that the operator was the employer and that the leader and the members of the band were its employees.

After the decision of the *Bartels* case in 1947, the union, representing the orchestra leaders, sought to find a way to protect them against the liability resulting from that decision. As appears from the proof in the present case, in 1949, the union prepared two riders designated riders A and B, respectively, one of which was to be affixed to the union's form B contract in accordance with the choice made by the operator.

By rider A, the union attempted again to make the ballroom operator the employer, despite the *Bartels* decision. It designated him as the employer in the rider and required him to agree to pay " all taxes and contributions payable by employers under any Federal or State law applicable to the services performed under the contract ". On the other hand, rider B accepted the *Bartels* decision, declaring the leader to be the employer, but it required the operator to pay an additional sum to the leader to make up for his added liability. Rider B read as follows: " Notwithstanding any other provision contained in this contract, it is agreed that the leader shall make the withholdings and pay the taxes and contributions payable by an employer with reference to the employment of the musicians other than himself. In the event that at any time liability for any such payments or withholdings shall be imposed on the purchaser of the music, the leader agrees to transfer any and all tax accounts to the name and credit of the purchaser of the musicians [sic]. It is further agreed that the price stated upon the face of the contract is hereby increased at an amount equal to 7% of such price as so stated, which sum shall be paid to the leader as an additional compensation.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Purchaser of the Music

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Leader "

In the present case, the Savoy Ballroom Corp., the appellant, elected to take the form B rider and throughout the period from January 1, 1950, to June 30, 1951, which is in controversy here, it entered into various form B contracts with orchestra leaders with rider B attached.* Also, the leader in each case signed a receipt for the moneys received by him from the appellant reading as follows: " The undersigned agrees that he is the employer of the band and will be responsible for all Social Security, Unemployment Insurance and Withholding Taxes as the employer."

---

* This case involved assessments for unemployment insurance contributions for the period from January 1, 1947, to June 30, 1951, but the appeal is taken only from that part of the decision which relates to the period from January 1, 1950, to June 30, 1951, the period during which the rider B was used. The appellant has conceded liability with respect to the period from January 1, 1947, to December 31, 1949, so that no question as to that period is before us.

It will be noted that, under rider B, the ballroom operator is no longer designated as the employer but as the purchaser of the music both in the text and in the descriptive title following the place for signature and it will also be noted that the terms of the rider are to override " any other provision contained in this contract ".

The *Statler* case had been decided against the hotel by the unemployment insurance referee on March 3, 1949, prior to the promulgation of the riders. Of course, the form B contracts which were involved in the *Statler* case did not have any rider attached to them. No decision had as yet been made by the board or by the courts in the *Statler* case at the time that the riders were promulgated by the union.

Under rider B, an additional 7% of the contract price was to be paid by the operator to the leader. Out of this, the latter was expected to pay 1½% for social security taxes to the Federal Government, 2.7% to the State of New York for unemployment insurance contributions and 3/10th of 1% to the Federal Government for unemployment insurance taxes (the Federal tax of 3% less credit for 2.7% paid to the State). The balance of 2½% was to be retained by the leader as reimbursement for the cost of bookkeeping and accounting.

In arriving at the 7% additional payment, the parties apparently assumed that the Federal and State decisions would be in harmony and that the leader would be held to be the employer by both the Federal and State authorities. However, the parties contemplated the possibility that the *Bartels* case might be overruled by a subsequent decision or statutory amendment and that the operator might again be held to be the employer, and the rider therefore contained a provision that, in that event, the leader would transfer to the purchaser the additional moneys paid to him for taxes. This reimbursement clause turned out to be ineffective when the State and Federal authorities took different views, the State board holding that the operator was the employer, and the Federal authorities continuing to follow the *Bartels* case. The leader was then required to pay the full 3% Federal tax to the Federal authorities, under their holding that he was the employer, and there was nothing left in his hands to repay to the operator to discharge the operator's State liability.

The referee held in the present case that the rider did not have any effect upon the relationship between the parties and that the operator was still liable under the State law for unemployment insurance contributions as the employer. The board

affirmed upon the opinion of the referee, which read as follows: "The *Statler* case is a binding authority for holding the employer herein, the purchaser of music under a form "B" contract, to be the employer of the musicians. The rider did not divest it of its status as employer. It is unnecessary to make any finding as to whether or not the employer herein in fact exercised supervision and control over the manner in which the musicians rendered services at its dance hall."

We take it that the last sentence of this opinion means not only that the referee found it unnecessary to make any finding as to whether the employer had in fact exercised supervision and control but also that he found it unnecessary to make any finding as to whether the employer in fact *had any right* to supervise and control the manner in which the musicians rendered their services. The referee apparently interpreted the court's decision in the *Statler* case as meaning that, as a matter of law, under a form B contract, the operator was to be treated as the employer for unemployment insurance purposes, regardless of whether he was in fact the employer. Since, according to the referee's view, the rider left the form B contract unimpaired, he held that the operator was still liable for the unemployment insurance contributions.

First of all, we believe that the referee and the board took too broad a view of the decision of this court in the *Statler* case. We affirmed the board's decision in the *Statler* case solely upon the ground that the decision lay within the realm of fact and that, upon the record before the board in that case, there was substantial evidence to support the finding that the operator was the employer. The court did not treat the contract terms as in and of themselves controlling, as the referee and the board had done. The contract terms, under the court's decision in the *Statler* case, merely constituted elements to be considered in deciding the overall question of fact as to the true nature of the relationship. In this respect, the court followed the principle laid down in *Matter of Morton (Miller)* (284 N. Y. 167, 175): " no written agreement may preclude an examination to determine whether the actual relationship is such as to bring the parties within the scope of the law." (See, also, *Matter of Electrolux Corp. [Miller]*, 288 N. Y. 440, 444, and *Matter of Realty Hotels [Corsi]*, 285 App. Div. 919.)

Secondly, the board in this case erred in rejecting the rider as having no significance. The rider nullified any inference that the operator was in fact the employer, which might otherwise

have been drawn from the designation of the operator as the " employer " in the main contract. The rider designated the operator as the purchaser of the music rather than as the employer of the musicians. This was reinforced by the form of the receipt signed by the leader which specifically stated that he was the employer. While the rider is not as explicit as it might have been, it should be borne in mind that it was drawn by the union and that the operator did not have any opportunity to participate in its phrasing. The rider did not expressly negate the provision in the main contract that " The employer shall at all times have complete control of the services " of the musicians but it will be noted that the provision as to control is tied to the designation of the operator as the employer and it may reasonably be concluded that when that designation was withdrawn by the rider, the provision as to control fell with it. This conclusion may the more readily be reached because of the fact that, as shown by the proof, the provision was only a fiction to begin with, designed to make the purchaser of the music the employer for tax purposes but never really intended to vest the right of control in him. The evidence in this record is overwhelmingly clear that the operator did not in fact have any right to control the manner of performance of the services under the contract. The contract provision, which had been given so much weight in the earlier cases, having been in effect overridden by the rider, there is no basis in the present record for a finding of fact that the operator was the employer. Indeed, as we have noted, the referee and the board have not even undertaken to make a finding of fact in this case on the issue of the actual relationship.

The rider in this case is substantially different from that before this court in the *Matter of Cassetta (Corsi)* (282 App. Div. 793, motion for leave to appeal denied 306 N. Y. 982). In that case, the rider simply stated that the leader "acknowledges that he conducts ' a name band ' and is therefore responsible for Social Security taxes and Unemployment taxes ". This was held to be an invalid attempt to shift liability from the employer to one who was in fact not the employer. The rider did not purport to qualify in any way the provisions of the contract designating the operator as the employer. Furthermore, the board had made a factual finding upon the evidence that the operator was the employer and the court said. " If, in fact, they [the musicians] are employees of the hotel, any acknowledgment which might be construed to the contrary does not alter their status."

If the board's decision in the present case is allowed to stand, the situation will be an extremely unsatisfactory one. The leader is not given any credit on his Federal tax liability for the payment made to the State by the operator since the payment is not made by the same employer. The leader therefore pays 3% to the Federal Government for unemployment insurance, and the operator pays 2.7% to the State. A total of 5.7% is thus paid upon the compensation of the musicians contrary to the scheme of the Unemployment Insurance Law, which contemplates a total payment of 3%. The statutes provide for a payment of 2.7% to the State and a credit for this payment against the Federal 3% tax, under the 90% credit clause, so that only 3/10th of 1% remains to be paid to the Federal Government.

Under the board's decision, the operator's payment to the State is computed not only upon the compensation paid to the musicians but also upon the balance of the contract price retained by the leader himself. This is, of course, improper if the leader is in fact an independent contractor and not an employee of the operator. The operator is required to pay the 2.7% to the State in addition to the 7% paid to the leader under the rider, supposedly in full for all State and Federal taxes. The operator thus pays a total of 9.7% of the contract price. He is worse off under this interpretation of the contract and rider than if he were held to be the employer in fact for both State and Federal purposes.

The need for harmonizing the Federal and State decisions is self-evident. The State and Federal statutes are integral parts of a single scheme. "State and federal unemployment relief systems [are] integrated in plan, function, and purpose" (*Illinois* v. *United States,* 328 U. S. 8, 11). If it is possible to do so, the State and Federal authorities ought to reach the same conclusion with respect to the identity of the employer so that overpayments of taxes may be avoided (*Matter of Rogers,* 269 App. Div. 551, affd. 296 N. Y. 676). There is no substantial difference between the State and Federal statutes which warrants different conclusions.* "While Federal  *  *  *  decisions are

---

* Subsequent to the decision of the *Bartels* case, Congress adopted an amendment to the Federal act so as to provide specifically that the term employee was not to include "(1) any individual who, under the usual common-law rules applicable in determining the employer-employee relationship, has the status of an independent contractor (2) any individual (except the officer of a corporation) who is not an employee under such common-law rules" (Internal Revenue Code [U. S. Code, tit. 26], § 1607, subd. [i]; § 1426, subd. [d]; as amd. by 62 U. S. Stat. 438 [June 14, 1948]). This amendment did not in any way affect

not binding on us they are highly persuasive and uniformity in interpretation is desirable '' (*Matter of Lazarus* [*Corsi*], 268 App. Div. 547, 554, affd. 294 N. Y. 613). Of course, there is always the possibility that a factual question may be decided differently by two different triers of the facts but that does not seem to be the cause of the present difficulty. The cause is rather the assumption by the board (1) that, as a matter of law, the form B contract makes the operator the employer and (2) that this ruling is not affected by the addition of rider B. As we have seen, both propositions are erroneous. The board should decide the question of the true relationship as a question of fact, not only in the light of the form B contract but also in the light of the rider B and the receipt, and in the light of the evidence as to the actual intent of the parties.

The decision of the Unemployment Insurance Appeal Board should be reversed and the case remitted to the board for further proceedings, without costs.

Foster, P. J., Bergan, Coon, and Zeller, JJ., concur.

Decision of the Unemployment Insurance Appeal Board reversed, and the matter remitted to the board for further proceedings, without costs.

---

the holding in the *Bartels* case. The amendment was designed rather to overcome the effect of *United States* v. *Silk* (331 U. S. 704) which held that even if the owner of an enterprise was not an employer under the common-law test, he might be held to be an employer in the light of " economic realities " for the purpose of determining the coverage of the Social Security Act. When the Treasury Department proposed new social security and unemployment insurance regulations incorporating this view, Congress reacted by the adoption of the statutory amendments, reaffirming the controlling force of the common-law test. While, in the *Bartels* case, the court referred to the " economic realities " rule under the *Silk* case, its holding that the band leader was the employer was amply justified under the common-law test and was not dependent upon any extended concept of the employer-employee relationship. The court held that it was the duty of the taxing authorities to go behind the contract terms and to ascertain the true situation; when this was done, it was evident that the leader was the true employer.

In any event, the amendment to the Federal statute now clearly makes the common-law test controlling so that the test is the same under the State and Federal law. The Federal authorities have consistently held the leader to be the employer since 1947 (Internal Revenue Bulletin [Cum. Bulletin, 1947–2], p. 177: Mimeograph Coll. No. 6187).