507 P.2d 108

**EMPLOYMENT SECURITY COMMISSION OF ARIZONA et al., Appellants,**

**v.**

**BRUCE CHURCH, INC., a corporation, et al., Appellees.**

**No. 10757.**

Supreme Court of Arizona,
In Banc.
March 14, 1973.

184

---

Gary K. Nelson, Atty. Gen. by James A. Tucker and Walter B. Brown, Asst. Attys. Gen., Phoenix, for appellants.

Rolle, Jones & Benton, Yuma, and Lewis & Roca by John P. Frank and Mary M. Schroeder, Phoenix, for appellees.

HOLOHAN, Justice:

The Employment Security Commission appeals from the judgment of the Superior Court of Yuma County, reversing the rul-ing of the Commission concerning the status of certain employees of Growers Service and Equipment Co. The Commission had ruled that the services performed by the employees in question were not exempt employment within the definitions of agricultural labor as set out in A.R.S. § 23-603, subsec. A, par. 2 or, subsec. A, par. 4.

The issue to be determined is whether the employees of Growers Service and Equipment Co. employed in the operation of the vacuum cooling plants are exempt agricultural labor under A.R.S. § 23-603, subsec. A, as it read prior to its amendment in 1971.

The facts of the case are not in dispute. Growers Service and Equipment Co., appellee, is a partnership composed of 12 partners who operate farms either as individuals or as corporations. One of the operations of the partnership is concerned with the sale of farm equipment and parts, and the second operation is the business of operating vacuum cooling plants. There is no question that the employees engaged in the sales and service operation are included within the provisions of the Employment Security Act, and the appellee has always paid the required contribution on the wages of those employees. It is the status of employees of the second operation which is in question. Growers Service and Equipment Co. has never paid any contribution to the unemployment compensation fund on the amounts of wages received by employees of the vacuum cooling operation.

The Employment Security Commission caused a notice to be served on appellees alleging failure by appellees to pay the required contributions required under the Employment Security Act on the amounts of wages paid the vacuum plant employees. The appellee requested a hearing urging that the employees in question were exempt under the Act. After the hearing the Commission ruled that the employees were not exempt, and Growers Service and Equipment Co. petitioned the superior court for judicial review which ultimately resulted in judgment being entered by the

superior court reversing the Commission ruling.

A description of the operation of the vacuum cooling business is set forth in the Findings of Fact made by the Commission. Growers Service and Equipment Co. is referred to as "The company" in the findings quoted:

"3. The company operates three vacuum cooling plants located on railroad sidings surrounded by farmland outside the limits of three Arizona cities—Yuma, Somerton and Welton [sic] . . . . From 75 to 90 per cent of the produce vacuum cooled comes from the farms of owners of the company; the rest from other farms in the Yuma, Somerton and Welton [sic] areas. Each carload or truckload of produce retains its owner's identity throughout the cooling process and the company never acquires ownership of any of the produce. Lettuce, the chief farm produce cooled, has been cut, field packed, and stapled in the final cardboard shipping cartons by employees on the individual farms prior to being shipped to a vacuum cooling plant. The vacuum cooling process is not a freezing process. The sole operation of a vacuum cooling plant is to bring the cartons of produce down to 33 degrees Fahrenheit. The company employees repack and restaple any cartons which have been opened for inspection by prospective buyers or in the plant's quality inspection process. The vacuum cooling plant ordinarily loses all contact with the produce once it has been reloaded by the company's employees into the cars or trucks, at which point the farmer-shippers arrange for its further disposition. The same fixed rate is charged all customers whether they are or are not partners in the company, and service is rendered strictly on a first-come, first-serve basis. . . . The company employs from 60 to 90 people on a daily basis in the cooling operation, depending on the amount of business. The vacuum cooling operation is carried on only during the harvesting season. The farmer-

shippers may sell some produce to local markets, but most of it is marketed throughout the continental United States and Canada. The county, state and federal regulations specify tolerances for spoilage beyond which the produce must be rejected. It is essential that the lettuce be cooled, and vacuum cooling is the most expedient principle for cooling in the industry."

A resolution of the issues of this case rests upon the interpretation to be given to the statutory exemption set forth in A.R.S. 23–617. One such exemption is for "agricultural labor," and during the years material to our consideration A.R.S. 23–603 defined the term:

"A. 'Agricultural labor' means and includes all services performed:

.    .    .    .    .    .

"2. In the employ of the owner or tenant or other operator of a farm, in connection with the operation, management, conservation, improvement or maintenance of the farm  .  .  .  .

.    .    .    .    .    .

"4. In handling,  . . .  processing, . . . or delivery  . . .  to a carrier for transportation to market, any agricultural or horticultural commodity, but only if the service is performed as an incident to ordinary farming operations or, in the case of fruits and vegetables, as an incident to the preparation of the fruits or vegetables for market. The provision of this paragraph shall not be deemed applicable with respect to service performed in connection with commercial canning or commercial freezing or in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption."

The term "agricultural labor" has been a troublesome term in both state and federal statutes. In 1941, the Arizona Legislature adopted substantially the definition of agricultural labor which had been enacted by Congress in the Internal Revenue Code in 1939 to become effective January, 1940.

*See* Employment Security Commission v. Arizona Citrus Growers, 61 Ariz. 96, 144 P.2d 682 (1944). A number of other states followed a similar practice of using the federal definition for agricultural labor. For a discussion of the cases from various jurisdictions which have ruled on the question of what constitutes agricultural labor, *see* the annotation in 53 A.L.R.2d 406 et seq.

Growers Service and Equipment Co. urges that its vacuum plant employees are exempt agricultural labor under either subsection 2 or 4.

The service performed by the vacuum plant employees appears to be covered by subsection 4 in that the employees handle, process, and deliver to a carrier an agricultural commodity, and the service is incident to the preparation of the vegetable for market.

The Commission, however, argues that the service performed is not handling or processing. To sustain this position, the Commission maintains that handling "is a verb of very broad, general meanings covering various activities." For this reason the Commission suggests that this Court should ignore all meanings listed in Webster's New International Dictionary, Second Edition, Unabridged, other than the first:

"1. To touch; to feel with the hand; to hold, take up, move, or otherwise affect, with the hand; to use the hands upon."

Since there is no actual touching by the hands of most of the employees at the vacuum cooling plants, the Commission concludes that the employees of Growers Service cannot be said to have "handled" the commodity.

To handle is also defined by the Second Edition of Webster's as:

"6. To deal with; to act upon; to perform some function with regard to; as, much mail matter was *handled*.

"7. To have pass through one's hands; to buy and sell; to deal, or trade, in; as, they *handle* only fruit. *Chiefly U.S.*"

These definitions have been accepted by other courts in interpretation of statutes. In State ex rel. Bell v. Phillips Petroleum Co., 349 Mo. 360, 160 S.W.2d 764 (1942), to handle was defined as to control, direct, to deal with, to act upon, to perform some function with regard to or to have passed through one's hands, to buy and sell, or to deal or trade in.

■ Although we have not found the word "handle" defined by a court in the precise context of A.R.S. § 23–603, subsec. A, it has been defined in similar contexts as above. We think that the broad definition of "handle" properly applies to the operation of the vacuum cooling plants. The employees have acted upon, dealt with and performed some function with regard to the lettuce incident to its preparation for market, and that is all that is necessary to come within the statute.

■■ It seems clear that the employees of Growers Service take part in "processing" the lettuce, and a process has been defined as a mode, method or operation, whereby a result is produced. Kelley v. Coe, 69 App.D.C. 202, 99 F.2d 435 (1938). It has also been defined as to prepare for market or to convert into marketable form. Reeves v. Fenley's Model Dairy, Inc., 314 Ky. 380, 235 S.W.2d 995 (1951). The vacuum cooling operation "prepares for market" the lettuce of the farmers, for it could not be successfully shipped to the ultimate consumer if it were not cooled before shipment. It follows that the vacuum cooling plant employees must be considered as engaged in processing the lettuce, and their activities fall within the services described in subsection 4 of the statute. The Commission asserts that the vacuum cooling operation is not incident to the preparation of the lettuce for market. Counsel for the Commission argues that lettuce packed in the field is ready to eat, hence ready for market, and the vacuum cooling is merely to preserve the product, not to change it in any way in preparation for market.

■ The position of the Commission in this regard is too narrow. In its findings

the Commission specifically recognized: "It is essential that the lettuce be cooled. . . . " Cooling of a perishable product is as much a preparation for market as is sizing, sorting, etc., all of which latter operations have been held to be part of agricultural labor. *See* 53 A.L.R.2d 406, § 8b, at 420–23. Roberts v. State Unemployment Compensation Comm., 215 Or. 100, 332 P. 2d 1067 (1958). The recognized test is not whether a fruit or vegetable may be ready to eat at some given stage of the process, but the proper test is whether the process is incident to the preparation of the product for the market selected by the farmer. The act does not limit the choice of market to the farmer, and if the farmer wishes to ship his product to a distant point it is obvious that in the case of perishable products some method of cooling is not only incidental but necessary to prepare that product for shipment to the selected market.

The services of the vacuum cooling plant employees are, in our judgment, an incident to the preparation of the lettuce for market.

█ Finally, the Commission argues that the employees of the vacuum plants are not exempt because the operations at the plants take place after the lettuce has been delivered to a terminal market for distribution for consumption. In essence it is the position of the Commission that the vacuum plants are in fact the terminal market for the lettuce.

In support of this position counsel for the Commission refers us to "terminal market" as defined in 55 C.J.S. 801, "a place of business to which products are shipped in a sorted, graded, packaged condition, ready for immediate sale." The quoted material was taken from Claim of Lazarus, 268 App.Div. 547, 52 N.Y.S.2d 682 (1944). The quotation from the case continues:

"If the product in the course of shipment reaches a warehouse in its raw or natural state, or partially sorted, but not yet fully processed and approved for public sale according to law, it is not yet prepared and ready for market; the intermediary warehouse, like the elevator, is not the 'terminal' delivery point for such products. After the product has been further completely processed it is deemed prepared 'for market' and then only is ready 'for distribution for consumption.'" (52 N.Y.S.2d at 687)

In the cited case the employer was held to be using agricultural labor in the picking and cleaning of beans even though the same operator eventually purchased the beans from the farmers with whom he contracted. It was noted that the federal agricultural regulations require that the beans be graded and cleaned before shipment in intrastate or interstate commerce; hence until that process was completed the beans were not at a terminal market ready for distribution.

The case at issue presents a far stronger instance than that of Claim of Lazarus, supra. Growers Service and Equipment Co. never acquires ownership of any of the produce according to the findings of the Commission, and in the same findings:

"The vacuum cooling plant ordinarily loses all contact with the produce once it has been reloaded by the company's employees into cars or trucks, at which point the farmer-shippers arrange for its further disposition."

The vacuum cooling plant is an intermediary point—not a terminal delivery point —for the lettuce. The cooling process prepares the product to be shipped elsewhere —the terminal delivery point from which distribution for consumption takes place.

The cases of Miller v. Burger, 161 F.2d 992 (9th Cir. 1947); Miller v. Bettencourt, 161 F.2d 995 (9th Cir. 1947); and Ewing v. McLean, 189 F.2d 887 (9th Cir. 1951); cited by the Commission are distinguishable from the instant case. In the cited cases the farmers sold their fruits or vegetables to the warehouse or packing house, and the farmers retained no further economic interest in the products. In the cited cases the warehouse or packing house

was the farmers' terminal market. It must be additionally noted that in apparently similar fact situations other courts have arrived at a contrary conclusion. See Michigan Unemployment Compensation Comm. v. Unionville Milling Co., 313 Mich. 292, 21 N.W.2d 135 (1946); Michigan Unemployment Compensation Comm. v. Appeal Board, 332 Mich. 194, 50 N.W.2d 755 (1952); Chester B. Brown Co. v. Employment Security Agency, 78 Idaho 166, 299 P.2d 487 (1956); and Chester B. Brown Co. v. United States, 152 F.Supp. 803 (D. Neb.1957). The fact situation in the Claim of Lazarus, supra, cited by counsel for the Commission, seems also to be contrary to the position in the above cited federal cases.

The Commission points out that sales may be negotiated or price arrived at on the premises of the partnership property. All these matters are dependent upon the delivery of a wholesome product to that buyer at the destination of the buyer. It is obvious that the farmer does not consider the product delivered to a terminal market until it is accepted by the buyer for payment. The farmer bears the risk of loss until the shipment is accepted by the buyer at the delivery point. Federal regulations specify tolerance for spoilage beyond which the produce will be rejected. The buyer does not have the ownership of the produce until he accepts the shipment at his delivery point. When the buyer has accepted a shipment, at his delivery point, the terminal market has been reached.

It is not necessary for us to discuss the application of subsection 2 to the present situation, having found that the employees of the vacuum cooling plants are exempt from the Employment Security Act as agricultural labor under subsection 4.

We agree with the judgment of the trial court that the employees of the vacuum cooling plants are exempt agricultural labor under the Employment Security Act, and Growers Service and Equipment Co. is not liable for contributions to the Commis-

sion on the amounts of the wages of such employees.

Affirmed.

HAYS, C. J., CAMERON, V. C. J., and STRUCKMEYER and LOCKWOOD, JJ., concur.